543 F.2d 489
 1 Fed. R. Evid. Serv. 323
 Renate HUNZIKER, Individually, and as a guardian and best
friend of Cornelia and Michael Hunziker, infants,
and as Administratrix of the Estate of
Paul J. Hunziker, Appellant in
No. 74-2236
v.
Wayne SCHEIDEMANTLE, Individually, et al., Appellees in No. 74-2236.
Appeal of Kenneth E. FOX, Jr., in No. 75-2152.
Appeal of Wayne SCHEIDEMANTLE, Individually, and Wayne
Scheidemantle, d/b/a Wayne's Bus Lines, in No. 75-2153.
 Nos. 74-2236, 75-2152, 75-2153.
 United States Court of Appeals,
Third Circuit.
 Argued May 6, 1976.
Decided Sept. 8, 1976.
 
 Joseph A. Katarincic, Kirkpatrick, Lockhart, Johnson & Hutchison, Pittsburgh, Pa., for Renate Hunziker.
 Gary F. Sharlock, Ropchek and Engel, Pittsburgh, Pa., for Kenneth E. Fox, Jr., etc.
 James P. McKenna, Jr., Dickie, McCamey & Chilcote, Pittsburgh, Pa., for Wayne Scheidemantle, etc.
 Donald W. Bebenek, Meyer, Darragh, Buckler, Bebenek & Eck, Pittsburgh, Pa., for Zelienople Municipal Authority and Halstead Industries.
 Before ALDISERT, GIBBONS and GARTH, Circuit Judges.
 OPINION OF THE COURT
 GARTH, Circuit Judge.
 
 
 1
 These appeals arise from the wrongful death and survival action commenced by the plaintiff Renate Hunziker, wife of Paul J. Hunziker. On the morning of October 8, 1971, Paul J. Hunziker (Hunziker) was killed when the single engine aircraft in which he was a passenger crashed after takeoff from the Zelienople Municipal Airport in Zelienople, Pennsylvania. Plaintiff brought this action against Wayne Scheidemantle, individually and doing business as Wayne's Bus Lines, the owner of the aircraft that crashed; Kenneth E. Fox, Jr., Administrator of the Estate of Harold Bennett, the pilot of the plane, who was also killed in the accident; the Zelienople Municipal Authority (Authority), the owner and lessor of the Zelienople Municipal Airport; and Halstead Industries, Inc. (Halstead), the lessee and operator of the Zelienople Municipal Airport.[1] At the end of the plaintiff's case the district court granted the Authority's and Halstead's motions for a directed verdict. Thereafter, the jury returned a verdict in favor of the plaintiff and against the defendants Scheidemantle and Fox in the amount of $482,600.50.[2]
 
 
 2
 Plaintiff appealed at No. 74-2236 from the entry of the directed verdicts in favor of the Authority and Halstead and from the amount of the jury verdict.[3] Defendants Scheidemantle and Fox appealed at Nos. 75-2152, 2153 from the judgment entered upon the jury verdict. Since the district court erred in granting a directed verdict in favor of Halstead and failed to adequately charge the jury with respect to liability we reverse and remand for a new trial.
 
 I.
 
 3
 The plaintiff tried her case principally on the theory that each of the defendants was negligent in permitting the aircraft to take off under the existing weather conditions. Plaintiff's evidence suggested that Hunziker's employer Berry Metals, Inc. had contracted with Scheidemantle for the round-trip air transportation of Hunziker and another Berry employee. Under this contract Scheidemantle allegedly arranged for Bennett to fly the plane.
 
 
 4
 Numerous witnesses testified that a dense fog blanketed the Zelienople Municipal Airport and the surrounding area immediately before and after the take off of Hunziker's flight. The aircraft lifted off the runway heading over various homes northwest of the airport and not over the lake as was the usual flight pattern. Within a few thousand feet of the runway, the aircraft struck a number of trees and crashed. The pilot Bennett, Hunziker, and the other Berry employee were all killed in the accident.
 
 
 5
 Plaintiff asserted liability as to Fox and Scheidemantle claiming negligence in the take off of the aircraft under conditions of limited visibility caused by the fog and in the flight of the plane. If, as plaintiff contended, Scheidemantle was acting as a "carrier for hire" and Bennett was his agent on this flight, then these defendants Scheidemantle and Fox would be liable for conduct by Bennett which violated their duty of exercising the highest degree of care with respect to the plaintiff's decedent. Gatenby v. Altoona Aviation Corporation, 407 F.2d 443, 446 (3d Cir. 1968).
 
 
 6
 Plaintiff's theory of negligence as to Halstead and the Authority was predicated on their failure to take any action to prevent the take off of Hunziker's flight. The evidence indicated that Bennett, the pilot, was also an employee of Halstead, serving as the airport manager of the Zelienople Municipal Airport. In the latter capacity Bennett allegedly was empowered to ground flights and had previously exercised that power. Thus, plaintiff contended that Bennett, as airport manager, and his employer Halstead under the doctrine of respondeat superior, were negligent in failing to close the airport under the poor weather conditions that existed on the morning of October 8, 1971.
 
 
 7
 Plaintiff's evidence with respect to the Authority indicated that the lessor Authority exercised no supervision or control over the Zelienople Municipal Airport. Based on the theory that the Authority could not abdicate its powers with respect to the airport, the plaintiff asserted that the Authority was negligent in failing to prevent the take off of Hunziker's flight in the fog.
 
 II.
 
 8
 Plaintiff urges on appeal that the district court erred in granting directed verdicts in favor of the Authority and Halstead and that the damage award was inadequate.
 
 A. The Authority
 
 9
 With respect to the Authority the plaintiff argues that a political subdivision cannot by signing a lease abdicate its public responsibility. She relies on two lines of authority: (1) Pennsylvania cases which hold that a municipality cannot delegate duties to a private party, and (2) the Restatement (Second) of Torts § 359 which imposes liability upon the lessor of land for harm caused to persons who enter the land. However, neither of these sources impose any duty upon the Authority under the circumstances presented here.
 
 
 10
 The Pennsylvania case law relied upon by the plaintiff imposes a duty upon a municipality to maintain its streets in a safe condition. See Green v. Borough of Freeport, 218 Pa.Super. 334, 280 A.2d 412 (1971). Under Pennsylvania law this duty may not be delegated to private parties. Id. However, the instant case does not involve public streets. Rather, it involves the lease of airport facilities for a term of thirty years by a public authority pursuant to state law. A lease, such as the one involved here, is recognized under Pennsylvania law as tantamount to the sale of the premises for a term. See Commonwealth v. Monumental Properties, Inc., 459 Pa. 450, 329 A.2d 812 (1974). Thus, the cases cited by the plaintiff provide no guidance in the factual context with which we are presented.
 
 
 11
 The plaintiff also relies upon the Restatement (Second) of Torts § 359.[4] That section imposes liability upon the lessor of land for physical harm caused to persons entering the land "by a condition of the land existing when the lessee takes possession" under three particular circumstances. However, § 359 is by its very terms inapplicable to our factual situation. The Restatement creates an exception to the general rule of non-liability of the lessor "where he has reason to expect that the lessee will admit the public before the land is put in reasonably safe condition for their reception." Restatement (Second) of Torts § 359, comment a. Here, the death of Hunziker did not result from any "condition of the land" which the lessee Halstead had not made safe. Rather, the crash allegedly resulted from the foggy conditions that limited visibility. Thus, plaintiff's reliance upon § 359 is misplaced.
 
 
 12
 We conclude that the plaintiff has failed to point to any precedent which imposes a duty upon a lessor-municipal authority for the lessee's operation of an airport with respect to weather conditions. Nor do we know of any. In the absence of any Pennsylvania law establishing such a duty,[5] the Authority was entitled as a matter of law to the withdrawal of the case from the jury and the entry of a verdict in its favor.[6] See 5A J. Moore, Federal Practice P 50.02(1) (2d ed. 1975). Therefore, the district court properly granted the Authority's motion for a directed verdict.B. Halstead
 
 
 13
 The plaintiff also argues that the district court erred in granting Halstead's motion for a directed verdict based on the absence of any duty with respect to the take off of aircraft at the Zelienople Municipal Airport. Plaintiff urges two separate grounds in support of her position: (1) even assuming that Halstead complied with all applicable state or federal regulations concerning the management of the airport, Halstead could still be found liable for unreasonable conduct under the facts presented here; and (2) that the prior conduct of Halstead's alleged airport manager Bennett established a duty of care with respect to departing flights.
 
 
 14
 It appears from the record that the Zelienople Municipal Airport was within uncontrolled airspace as that term is defined in the Federal Aviation Administration (FAA) regulations.[7] Therefore aircraft could take off and land at the airport without clearance or permission since the airport did not have a control tower. Although Zelienople Municipal Airport was uncontrolled, plaintiff adduced evidence from which a jury could find that Halstead possessed and exercised the power to prevent aircraft from taking off. The Rules and Regulations of the Zelienople Municipal Airport empowered the airport manager to ground any pilot who handled an aircraft in a "careless, reckless or incompetent manner." Plaintiff's Exhibit No. 40. Even more importantly, plaintiff presented testimony that on three earlier occasions Bennett, as airport manager for Halstead, closed down the Zelienople Municipal Airport because of weather conditions.
 
 
 15
 Based upon the evidence presented we need not decide plaintiff's first contention respecting the duty of an operator of an uncontrolled airport as to the take off of flights. For construing plaintiff's testimony in a light most favorable to her, Denneny v. Siegel, 407 F.2d 433, 439 (3d Cir. 1969), it appears that Halstead through its airport manager had on occasion prevented aircraft from taking off from Zelienople Airport when weather conditions were hazardous. Such evidence was admissible to establish the proper standard of conduct under the circumstances. 2 F. Harper and F. James, Jr., The Law of Torts, § 17.3 (1956); W. Prosser, Handbook of The Law of Torts, § 33 (3d ed. 1964). With this evidence before the jury the district court erred in determining as a matter of law that Halstead owed no duty to Hunziker with respect to the grounding of flights. The evidence of Bennett's prior actions as airport manager created a jury question as to whether the failure to close the airport on the morning of October 8, 1971 constituted negligence. Thus, Halstead's motion for a directed verdict should have been denied,[8] and plaintiff must be afforded an opportunity to establish liability as to Halstead.[9]
 
 C. Damages
 
 16
 Plaintiff finally contends that the damage award as against Scheidemantle and Fox was inadequate in that it failed to take into account the loss of decedent's services to the household and it failed to properly take into consideration Hunziker's future earnings. Since we conclude infra that the jury verdict against Scheidemantle and Fox must be reversed and a new trial held, we do not address plaintiff's arguments with respect to damages.
 
 III.
 
 17
 Scheidemantle and Fox, against whom the plaintiff obtained her judgment, urge that the district court erred in denying their motions for judgment n. o. v. or in the alternative, for a new trial. Both defendants contend: (1) that there was a total absence of proof that Bennett was negligent; and (2) that the plaintiff failed to establish that Bennett's negligence, if any, was a proximate cause of the accident. Scheidemantle and Fox also assert numerous errors in the admission of evidence and in the district court's charge to the jury.[10]
 
 
 18
 The plaintiff counters these assertions by arguing that there was ample evidence that Bennett's take off in the foggy conditions on October 8, 1971 represented a breach of his duty of care to plaintiff's decedent, as well as conduct in violation of the FAA regulations. Referring to the issue of proximate cause, the plaintiff takes two positions. First, she urges that there was an adequate basis to conclude that the take off in foggy weather constituted negligence and was the proximate cause of the crash. Second, plaintiff argues that the district court erred in denying her requested charge to the jury on the theory of res ipsa loquitur.[11] Thus, she contends that even if her evidence did not establish proximate cause, the jury should have been instructed that it could infer that the take off in the fog constituted negligence and was the proximate cause of the crash.
 
 A.
 
 19
 It is clear that "the liability of a defendant for injury or damages to another is predicated upon a connection between his negligent acts or omissions and the injuries sustained." Whitner v. Von Hintz, 437 Pa. 448, 263 A.2d 889, 892 (1970). This requisite "connection is most commonly called 'proximate cause.' " Id. at 893. Pennsylvania courts have adopted as the definition of "proximate cause" the Restatement (First and Second) of Torts § 431 formulation:
 
 
 20
 The actor's negligent conduct is a legal cause of harm to another if
 
 
 21
 (a) his conduct is a substantial factor in bringing about the harm, . . . .
 
 
 22
 Thus, the burden was upon the plaintiff to not only establish negligence as to the defendants, but also to prove that this negligence was a substantial factor in bringing about Hunziker's death.
 
 
 23
 Plaintiff presented testimony that a heavy fog blanketed much of the area surrounding the Zelienople Municipal Airport on the morning of the crash. After the aircraft lifted off the runway it was heard flying directly above the home of one of the witnesses, on a flight path different from that usually followed. There was testimony that the noise of the engines continued without reduction until the crash. Moreover, the pilot was a very experienced flier. Within a short distance of the runway the aircraft struck a number of trees and crashed. There was also testimony that efforts to find the plane were hampered by the fog that enveloped the site of the wreckage. Furthermore, all instruments aboard the aircraft were destroyed.
 
 
 24
 Other than this summarized evidence and certain FAA regulations which plaintiff contends were violated, there is little else in the record bearing on the issue of negligence and causation. It cannot be contended that the evidence as to the poor weather conditions prevailing on the morning of October 8, 1971 was legally insufficient to permit a jury to conclude that Bennett was negligent in taking off.[12]
 
 
 25
 However, the record is extremely thin as to whether this negligence, if any, was the proximate cause of the accident. Nevertheless we conclude that we need not decide whether plaintiff failed to produce that minimal quantum of evidence as to causation necessary to take the case to the jury. For even if this record is legally deficient with respect to direct evidence of causation, the plaintiff requested and was denied a charge on the theory of res ipsa loquitur. As previously noted, see n. 11 supra, we believe such a charge was appropriate under the circumstances presented here and would have permitted the jury to infer both negligence and causation. It would therefore be inappropriate to enter judgment notwithstanding the verdict in favor of the defendants; rather we would be obliged to order a new trial with a charge on res ipsa loquitur. Even if plaintiff's evidence were legally sufficient to go to the jury, we conclude, infra, that this case was submitted to the jury with inadequate instructions concerning liability. Since in either event we would be compelled to order a new trial, we believe this question of the legal sufficiency of the evidence respecting causation should be properly left for the district court's consideration on the record to be developed on retrial.
 
 B.
 
 26
 Having concluded that Scheidemantle and Fox are not entitled to judgment n. o. v., we turn to their arguments supporting their motions for a new trial. In this connection we find merit in their contentions that their liability was submitted to the jury upon inadequate and unclear instructions.
 
 
 27
 Plaintiff's theory that the take off of the aircraft in the weather conditions prevailing on October 8, 1971 constituted negligence, consisted of two separate arguments. First, the plaintiff asserted that Bennett acted unreasonably under the circumstances. Second, the plaintiff urged that Bennett's conduct violated certain FAA regulations and thus constituted negligence per se. A finding of negligence by the jury could therefore be predicated upon either of these contentions.
 
 
 28
 In an effort to establish negligence per se of the defendants, the plaintiff produced and had admitted into evidence some 65 different FAA regulations all of which concern and govern various aspects of airplane operation and flight. The subject matter of these regulations ranged from rules concerning liquor and drugs (Section 91.11) to weather minimums (Section 91.105) and advertising (Section 135.45). Although all of the 65 regulations were admitted in evidence, only two of the regulations were read and argued to the jury by plaintiff's counsel. None were read or explained by the court in its charge.
 
 
 29
 Unfortunately, the summations made to the jury do not appear in the record. We are therefore unable to ascertain exactly what it was that counsel read and argued to the jury whether all of each regulation was read, or only a part thereof or if a part, which part. All that we do know is that plaintiff's counsel read from Sections 91.105 (Basic VFR (Visual Flight Rules) Weather Minimums) and 91.116[13] (Takeoff and Landing under IFR (Instrument Flight Rules): General).
 
 
 30
 Our reading of the two detailed regulations which were read to the jury reveals that both regulations contain in their text internal references to still other regulations. However, we cannot tell if these latter regulations were explained or read to the jury. Moreover, at least § 91.105 employs terms in its text which are elsewhere defined in still other regulations. For an example of both circumstances, the text of § 91.116 refers to "Part 121, 123, 129 or 135 of this Chapter." We cannot determine whether in reading from § 91.116 these other sections were explained, referred to, or read to the jury. Further, § 91.105 uses various terms such as "flight visibility" and "controlled airspace" which are specifically defined in other sections of the regulations. Again we cannot ascertain whether the jury was informed of the relevant definitions when the regulation was read to it.
 
 
 31
 This Court has thus been deprived of any means of knowing whether the standards of care established by the FAA regulations were properly explained to the jury. We find this especially troublesome since under Pennsylvania law, the violation of a government safety regulation, such as the FAA regulations here, constitutes negligence per se. Gatenby v. Altoona Aviation Corporation, supra. Thus, the particular information given to the jury pertaining to the precise weather standards for take off (as established in §§ 91.105 and 91.116) nowhere appears in the record and is accordingly not available for our review. Yet these standards had to be highly relevant to the plaintiff's theory of negligence and may well have been determinative of the jury's findings on that issue against the defendants. However all that this record reveals is that the district court in its charge instructed the jury that any violation of a regulation constituted negligence per se,[14] but in so charging, the district court neither referred to, explained, nor specified any particular regulation as being relevant to the question of negligence.
 
 This Court has held that:
 
 32
 (2, 3) It is the responsibility of the trial judge to provide the jury with a clear and accurate statement of the law it is expected to apply in reaching its verdict. . . . As long as the instructions "show no tendency to confuse or mislead the jury," an appellate court will presume that the jury's verdict was reached in accordance with the law.
 
 
 33
 McPhee v. Reichel, 461 F.2d 947, 950-51 (3d Cir. 1972). The jury must be able to "intelligently determine the questions presented." Delancey v. Motichek Towing Service, Inc., 427 F.2d 897, 902 (5th Cir. 1970). Here, however, with no explanation, interpretation, direction, or guidance by the district court, the jury was exposed to two complex regulations. At best they were read to the jury together with the related regulations and definitions. More likely, they were presented to the jury without definitional explanation and with no reference to the related regulations. In either event, the jury at no time was afforded a clear and accurate statement of these rules of law which it was to apply in reaching its verdict. McPhee v. Reichel, supra.
 
 
 34
 Even more significantly, these regulations establishing a standard of care constituted the only evidence on the issue of negligence as to which a negligence per se standard obtained. Yet the court failed to instruct the jury that if indeed it found that a violation of a regulation had occurred, it could not find a defendant negligent unless it also found that the violation was a substantial factor in causing the accident. See Whitner v. Von Hintz, supra; Gatenby v. Altoona Aviation Corporation, supra.
 
 
 35
 We are obliged to conclude that even though the FAA regulations may have represented but one segment of the plaintiff's proofs, the manner in which these complex rules were presented to the jury combined with the inadequacies of the court's charge had to have a disproportionate and material effect on the jury's consideration of the negligence issue. This is so particularly since the jury was instructed that any violation of the regulations constituted negligence per se.
 
 
 36
 Since the jury returned a general verdict, we have no way of knowing whether the jury in finding Scheidemantle and Fox negligent, based its determination upon violations of the FAA regulations or on evidence without reference to these regulations. However, it is not our function to speculate on how, or to what extent, or whether, the FAA regulations were relied upon by the jury in its finding that the defendants were negligent. Having determined that the McPhee standard was not satisfied, we conclude that a new trial is necessary.
 
 IV.
 
 37
 We conclude that the district court properly granted the Authority's motion for a directed verdict, but erred in granting a directed verdict in favor of the defendant Halstead. Moreover the district court also erred in failing to properly explain or relate the FAA regulations to the facts of this case in its instructions to the jury. Consequently we will reverse and remand for a new trial consistent with the foregoing, as to the defendants Halstead, Scheidemantle and Fox.
 
 
 38
 APPENDIX "A"
 
 
 39
 § 91.105 Basic VFR weather minimums.
 
 
 40
 (a) Except as provided in § 91.107, no person may operate an aircraft under VFR when the flight visibility is less, or at a distance from clouds that is less, than that prescribed for the corresponding altitude in the following table:
 
 
 41
 -------------------------------------------------------------------------------
 Altitude Flight Visibility Distance from clouds
-------------------------------------------------------------------------------
1,200 feet or less above the
 surface (regardless of
 MSL altitude)--
 Within controlled ( 500 feet below.
 airspace ................ 3 statute miles ....... ( 1,000 feet above.
 ( 2,000 feet horizontal.
 Outside controlled
 airspace ................ 1 statute mile except Clear of clouds.
 as provided in Sec.
 91.105(b)
More than 1,200 feet above
 the surface but less than
 10,000 feet MSL--
 Within controlled ( 500 feet below.
 airspace ................ 3 statute miles ....... ( 1,000 feet above.
 ( 2,000 feet horizontal.
 Outside controlled ( 500 feet below.
 airspace ................ 1 statute mile ........ ( 1,000 feet above.
 ( 2,000 feet horizontal.
More than 1,200 feet above
 the surface and at or above ( 1,000 feet below.
 10,000 feet MSL. 5 statute miles ....... ( 1,000 feet above.
 ( 1 mile horizontal.
 
 
 42
 (b) When the visibility is less than one mile, a helicopter may be operated outside controlled airspace at 1,200 feet or less above the surface if operated at a speed that allows the pilot adequate opportunity to see any air traffic or other obstruction in time to avoid a collision.
 
 
 43
 (c) Except as provided in § 91.107, no person may operate an aircraft, under VFR, within a control zone beneath the ceiling when the ceiling is less than 1,000 feet.
 
 
 44
 (d) Except as provided in § 91.107, no person may take off or land an aircraft, or enter the traffic pattern of an airport, under VFR, within a control zone
 
 
 45
 (1) Unless ground visibility at that airport is at least 3 statute miles; or
 
 
 46
 (2) If ground visibility is not reported at that airport, unless flight visibility during landing or takeoff, or while operating in the traffic pattern, is at least 3 statute miles.
 
 
 47
 (e) For the purposes of this section, an aircraft operating at the base altitude of a transition area or control area is considered to be within the airspace directly below that area.
 
 
 48
 (Amdt. 91-51, 33 F.R. 2992, Feb. 15, 1968)
 
 
 49
 § 91.116 Takeoff and landing under IFR: General.
 
 
 50
 (a) Instrument approaches to civil airports. Unless otherwise authorized by the Administrator (including ATC), each person operating an aircraft shall, when an instrument letdown to an airport is necessary, use a standard instrument approach procedure prescribed for that airport in Part 97 of this chapter.
 
 
 51
 (b) Landing minimums. Unless otherwise authorized by the Administrator, no person operating an aircraft (except a military aircraft of the United States) may land that aircraft using a standard instrument approach procedure prescribed in Part 97 of this chapter unless the visibility is at or above the landing minimum prescribed in that part for the procedure used. If the landing minimum in a standard instrument approach procedure prescribed in Part 97 of this chapter is stated in terms of ceiling and visibility, the visibility minimum applies. However, the ceiling minimum shall be added to the field elevation and that value observed as the MDA or DH, as appropriate to the procedure being executed.
 
 
 52
 (c) Civil airport takeoff minimums. Unless otherwise authorized by the Administrator, no person operating an aircraft under Part 121, 123, 129, or 135 of this chapter may take off from a civil airport under IFR unless weather conditions are at or above the weather minimums for IFR takeoff prescribed for that airport in Part 97 of this chapter. If takeoff minimums are not prescribed in Part 97 of this chapter, for a particular airport, the following minimums apply to takeoffs under IFR for aircraft operating under those parts:
 
 
 53
 (1) Aircraft having two engines or less: 1 statute mile visibility.
 
 
 54
 (2) Aircraft having more than two engines: One-half statute mile visibility.
 
 
 55
 (d) Military airports. Unless otherwise prescribed by the Administrator, each person operating a civil aircraft under IFR into, or out of, a military airport shall comply with the instrument approach procedures and the takeoff and landing minimums prescribed by the military authority having jurisdiction on that airport.
 
 
 56
 (e) Comparable values of RVR and ground visibility. (1) If RVR minimums for takeoff or landing are prescribed in an instrument approach procedure, but RVR is not reported for the runway of intended operation, the RVR minimum shall be converted to ground visibility in accordance with the table in subparagraph (2) of this paragraph and observed as the applicable visibility minimum for takeoff or landing on that runway.
 
 
 57
 Visibility
RVR (feet) (statute miles)
 1,600 .... 1/4
 2,400 .... 1/2
 3,200 .... 5/8
 4,000 .... 3/4
 4,500 .... 7/8
 5,000 .... 1
 6,000 .... 1 1/4
 
 
 58
 (f) Operation on unpublished routes and use of radar in instrument approach procedures. When radar is approved at certain locations for ATC purposes, it may be used not only for surveillance and precision radar approaches, as applicable, but also may be used in conjunction with instrument approach procedures predicated on other types of radio navigational aids. Radar vectors may be authorized to provide course guidance through the segments of an approach procedure to the final approach fix or position. When operating on an unpublished route or while being radar vectored, the pilot, when an approach clearance is received, shall, in addition to complying with § 91.119, maintain his last assigned altitude (1) unless a different altitude is assigned by ATC, or (2) until the aircraft is established on a segment of a published route or instrument approach procedure. After the aircraft is so established, published altitudes apply to descent within each succeeding route or approach segment unless a different altitude is assigned by ATC. Upon reaching the final approach fix or position, the pilot may either complete his instrument approach in accordance with the procedure approved for the facility, or may continue a surveillance or precision radar approach to a landing.
 
 
 59
 (g) Use of low or medium frequency simultaneous radio ranges for ADF procedures. Low frequency or medium frequency simultaneous radio ranges may be used as an ADF instrument approach aid if an ADF procedure for the airport concerned is prescribed by the Administrator, or if an approach is conducted using the same courses and altitudes for the ADF approach as those specified in the approved range procedure.
 
 
 60
 (h) Limitations on procedure turns. In the case of a radar initial approach to a final approach fix or position, or a timed approach from a holding fix, or where the procedure specifies "NOPT" or "FINAL", no pilot may make a procedure turn unless, when he receives his final approach clearance, he so advises ATC.
 
 
 61
 (Sec. 607, 72 Stat. 779, 49 U.S.C. § 1427)
 
 
 62
 (Amdt. 91-44, 33 F.R. 13910, Oct. 6, 1967, as amended by Amdt. 91-60, 33 FR 12888, Sept. 12, 1968; Amdt. 91-126, 40 FR 10451, Mar. 6, 1975)
 
 
 
 [1]
 The complaint also named the Borough of Zelienople as a defendant. At the end of the plaintiff's case the Borough moved for a directed verdict to which the plaintiff consented and which the district court accordingly granted. Thus, the Borough is not a party to the appeals now before us. App. at 1201-1202
 
 
 [2]
 The jury apportioned the damages as follows: $430,214.00 under the wrongful death action and $52,386.50 under the survival action
 
 
 [3]
 After the plaintiff filed her notice of appeal from the directed verdicts and the judgments entered upon the jury's verdict, the defendants Scheidemantle and Fox filed timely motions in the district court for judgment notwithstanding the verdict or in the alternative for a new trial. This Court remanded the case to the district court for prompt disposition of the pending motions subject to the conditional retention of jurisdiction. Hunziker v. Scheidemantle, 518 F.2d 829 (3d Cir. 1975). Thereafter the district court denied the defendants' motions. The plaintiff's appeal at No. 74-2236 was then consolidated with the appeals of Scheidemantle and Fox at Nos. 75-2152, 2153
 
 
 [4]
 The Restatement (Second) of Torts § 359 states:
 A lessor who leases land for a purpose which involves the admission of the public is subject to liability for physical harm caused to persons who enter the land for that purpose by a condition of the land existing when the lessee takes possession, if the lessor
 (a) knows or by the exercise of reasonable care could discover that the condition involves an unreasonable risk of harm to such persons, and
 (b) has reason to expect that the lessee will admit them before the land is put in safe condition for their reception, and
 (c) fails to exercise reasonable care to discover or to remedy the condition, or otherwise to protect such persons against it.
 
 
 [5]
 Since our jurisdiction is predicated upon 28 U.S.C. § 1331 (diversity of citizenship; amount in controversy), we are bound by the substantive law of Pennsylvania, the forum and site of the accident. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)
 
 
 [6]
 This Court has recognized that the standard to be applied in determining whether the district court erred in directing a verdict is identical under federal or Pennsylvania law. See Dougherty v. Hooker Chemical Corp., 540 F.2d 174 (3d Cir. 1976). We have stated the standard against which the grant of a motion for a directed verdict is to be measured as follows:
 . . . (E)xamin(ing) the record in a light most favorable to the plaintiff, . . . (w)e must determine whether, as a matter of law, the record is critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief.
 Denneny v. Siegel, 407 F.2d 433, 439 (3d Cir. 1969).
 
 
 [7]
 Uncontrolled airspace is airspace within which aircraft are not subject "to air traffic control." 14 CFR § 1.1 (1976)
 
 
 [8]
 A directed verdict should not be granted for a defendant "if there is evidence reasonably tending to support the recovery by plaintiff as to any of its theories of liability." Dougherty v. Hooker Chemical Corp., 540 F.2d 174, 178 (3d Cir. 1976)
 
 
 [9]
 See n. 6 supra. Our conclusion that the district court erred in granting a directed verdict in favor of Halstead is based solely on that evidence from which a jury might conclude that Halstead owed a duty of care to the plaintiff's decedent, which duty was breached. We have not been presented with, nor have we considered, any issue of causation as to Halstead. In light of the fact that a new trial will be required as to all issues (see infra) it would be meaningless to discuss the issue of causation on the present record. Rather, that issue, as with all other issues, will be for the consideration of the district court on retrial
 
 
 [10]
 The record offers no support for many of the errors which the defendants claim were committed by the district court. For example, it is contended that the district court did not instruct the jury on "present worth" when charging on the damage aspect of the case. Yet even a cursory reading of the court's charge dispels the validity of this argument. Similarly, we find other of the claimed errors to be without merit. However, we do find it necessary to refer to one of the asserted errors, which we discuss here only because of the likelihood that on retrial the same or similar evidence may be offered
 Both defendants Fox and Scheidemantle complained that the district court permitted testimony of insurance coverage. The plaintiff asserts that such testimony is appropriate where it is offered to prove something other than liability coverage, in this case an agency relationship which was claimed to exist between Bennett and Scheidemantle. We agree that such evidence may be admissible if offered for other relevant purposes and if its exclusion would be more prejudicial to the plaintiff here than its admission would be to the defendants. See Rule 411, Federal Rules of Evidence; Posttape Associates v. Eastman Kodak Co., 537 F.2d 751 (3d Cir. 1976). Our review of the present record however, indicates that the evidential foundation which could be developed to support the introduction of this evidence is equivocal and weak, i. e., questions appear as to whether the insurance contract was in fact evidence of an agency relationship in the context of this case. Hence, we suggest that if such evidence is to be offered on retrial, the district court should require the necessary foundation to be established outside the presence of the jury so that it may determine the admissibility of such evidence without prejudice to the rights of the parties.
 
 
 [11]
 The district court denied the plaintiff's request for a charge on the theory of res ipsa loquitur. As we read the present record, we are of the opinion that the district court erred in refusing to so charge. Pennsylvania, whose law we must apply, Erie R. Co. v. Tompkins, supra; Sierocinski v. E. I. DuPont De Nemours & Co., 118 F.2d 531 (3d Cir. 1941), has recently adopted the formulation of the Restatement (Second) of Torts § 328D which reads:
 (1) It may be inferred that harm suffered by the plaintiff is caused by negligence of the defendant when
 (a) the event is of a kind which ordinarily does not occur in the absence of negligence;
 (b) other responsible causes, including the conduct of the plaintiff and third persons, are sufficiently eliminated by the evidence; and
 (c) the indicated negligence is within the scope of the defendant's duty to the plaintiff.
 (2) It is the function of the court to determine whether the inference may reasonably be drawn by the jury, or whether it must necessarily be drawn.
 (3) It is the function of the jury to determine whether the inference is to be drawn in any case where different conclusions may reasonably be reached.
 In adopting this doctrine the Pennsylvania Supreme Court emphasized that
 res ipsa loquitur is neither a rule of procedure nor one of substantive tort law. It is only a shorthand expression for circumstantial proof of negligence a rule of evidence.
 Gilbert v. Korvette, Inc., 457 Pa. 602, 327 A.2d 94, 99 (1974). If on retrial the elements of § 328D are satisfied by the plaintiff as we think they were in this record, the plaintiff would be entitled to a res ipsa charge. See Cox v. Northwest Airlines, Inc., 379 F.2d 893 (7th Cir. 1967) cert. denied, 389 U.S. 1044, 88 S.Ct. 788, 19 L.Ed.2d 836 (1968); Citrola v. Eastern Airlines, Inc., 264 F.2d 815 (2d Cir. 1959); Restatement (Second) of Torts § 328D, Illustration 3; W. Prosser, Handbook of The Law of Torts 220-21, 236 (3d ed. 1964). Under such a charge a jury is permitted to infer not only negligence but causation.
 
 
 [12]
 In considering the district court's denial of defendants' motions for judgment n. o. v., we must view the evidence in a light most favorable to the party who secured the jury verdict, the plaintiff. 5A J. Moore, Federal Practice P 50.07(2) at 2357 (2d ed. 1975); Walsh v. Miehle-Goss-Dexter, Inc., 378 F.2d 409, 412 (3d Cir. 1967)
 
 
 [13]
 These regulations, due to their length, are attached to this opinion as Appendix A
 
 
 [14]
 The district court charged as follows on negligence per se :
 Now, another point that should be mentioned is, in discussing negligence, that there is what we call negligence, per se. That is something which, in itself, is negligence or amounts to negligence without examining what was done under the standard of due care of what a reasonable or prudent person would or would not have done. This is where there is violation of a law or a statute or, as in this case, a regulation duly made by the Federal Aviation Administration. Such regulations, pursuant to an act of Congress, regulating air navigation have the force of law, and, therefore, a violation of a regulation, if established and you are the sole judges of the facts as to whether any conduct occurred which did violate a regulation of the FAA, but, if you find that such conduct did occur in violation of the FAA, that circumstance, in and of itself, would constitute negligence or, in other words, it would be negligence per se. In other words, to give an illustration, if there is a statute that says the speed limit shall be 55 miles an hour and you are driving, say, 60 miles an hour, it may well be that that is perfectly safe and, as a matter of fact, is not negligent under the common standard of what a prudent person would have done or would not have done, but, because it violates the specific prescription or requirements set up in the law, it does constitute negligence in and of itself or negligence per se, so, if you find any violation of an FAA regulation, that would also be negligence, per se.