718 F.2d 553
 14 Fed. R. Evid. Serv. 257
 Harrikah I. STANTON, a Minor, by Ruby BROOKS (nee Stanton),
her Parent and Guardian, and Ruby Brooks,
Appellees in No. 82-3364,
Cross-Appellants in No. 82-3380,
v.
ASTRA PHARMACEUTICAL PRODUCTS, INC., Appellant in No.
82-3364, Cross-Appellee in No. 82-3380.
 Nos. 82-3364, 82-3380.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 28, 1983.
Decided Sept. 26, 1983.
 
 James W. Evans (argued), Goldberg, Evans & Katzman, P.C., William D. Boswell, Berman, Boswell & Tintner, Harrisburg, Pa., for Astra Pharmaceutical Products, Inc.
 Frank M. McClellan (argued), Phoebe H. Northcross, Philadelphia, Pa., Allen T. Eaton, Allen T. Eaton & Associates, Washington, D.C., for Harrikah I. Stanton and Ruby Brooks.
 Before ADAMS, WEIS and BECKER, Circuit Judges.
 OPINION OF THE COURT
 BECKER, Circuit Judge.
 
 
 1
 On December 2, 1971, Harrikah I. Stanton, then eight months old, suffered an adverse reaction to Xylocaine, a local anesthetic, and experienced cardiac and respiratory arrest, resulting in severe and irreversible brain damage. Ruby Brooks, Harrikah's mother, brought this diversity negligence and products liability action on behalf of herself and her daughter (the "plaintiffs") against Xylocaine's manufacturer, Astra Pharmaceutical Products, Inc. The suit alleged, inter alia, that Astra had been negligent in failing to file with the Food and Drug Administration (the "FDA") certain reports concerning Xylocaine, as required by federal statutes and regulations, and that the failure to file the reports also rendered Xylocaine a defective product within the meaning of Restatement (Second) of Torts Sec. 402A. Mrs. Brooks further asserted that the failure to file and the defective nature of the drug were substantial factors in causing her daughter's injuries. After an eight-week trial, the jury found Astra liable to plaintiffs on the above bases and awarded compensatory but not punitive damages. When the Pennsylvania Supreme Court subsequently changed the law regarding calculation of damages, however, the district court granted a new trial limited to computation of compensatory damages. Plaintiffs obtained a jury verdict of $2,367,032, on which judgment was entered.
 
 
 2
 Astra appeals from that judgment, claiming (a) that the federal statutes and regulations asserted as the basis for liability did not apply to Xylocaine and that, at all events, the evidence was insufficient to support the verdict on liability; (b) that the district court erred in resubmitting "special questions" on liability to the jury after the jury had returned the questionnaire containing answers inconsistent with its award of damages; (c) that the court abused its discretion in granting a new trial limited only to damages; and (d) that the court erred in denying Astra's motion for a mistrial based on prejudicial comments by plaintiffs' counsel in his opening statement during the retrial on damages. On cross-appeal, plaintiffs contend that several evidentiary rulings by the district court allegedly prejudiced their ability to prevail on their claim for punitive damages.
 
 
 3
 For the reasons that follow, we conclude that Astra did have an obligation to comply with the relevant statutes and regulations and that, although the question of causation is extremely close, plaintiffs introduced sufficient evidence to support the verdict in their favor. We also conclude that the district court acted within its discretion in resubmitting the "special questions" to the jury. However, because we hold that the court abused its discretion in granting a new trial limited only to damages, we will vacate the judgments as to liability and damages and remand for a new trial on both issues. Because several of the procedural and evidentiary questions raised in these appeals are likely to recur on retrial, we address those matters as well.
 
 II. Factual and Procedural Background
 
 4
 Harrikah Stanton was an eight-month-old infant on December 2, 1971, when she entered Harrisburg Hospital and submitted to a bone-marrow test to determine the cause of the hemolytic anemia from which she had suffered since birth. In performing the test, the hematologist, Dr. Herbert S. Bowman, injected a two-percent solution of Xylocaine into Harrikah's right posterior iliac crest to anesthetize the area from which he would aspirate bone marrow. The Xylocaine, known generically as lidocaine hydrochloride, was a local anesthetic manufactured by Astra.
 
 
 5
 Shortly after the procedure, Harrikah began convulsing and experienced cardiac and respiratory arrest. Dr. Marita Fabian, a senior resident at the hospital, and other hospital employees attempted to resuscitate her, but to little avail. The cardiac arrest resulted in severe and irreversible brain damage. Harrikah cannot walk, talk, or stand; her development has not progressed beyond that of a three- to four-month old child. She will require constant care for the rest of her life.
 
 
 6
 On October 24, 1973, plaintiffs commenced this negligence and product-liability action against Astra, Harrisburg Hospital, and Drs. Bowman and Fabian.[1] Plaintiffs pressed a host of claims against Astra, charging that the company had been negligent in (a) failing adequately to warn Dr. Bowman and the physician-employees at Harrisburg Hospital of a possible toxic reaction to Xylocaine, even in a proper pharmacological dose, when administered to a child of Harrikah's age; (b) failing adequately to warn Dr. Bowman and the Hospital's physician-employees of the need for immediate availability of resuscitative equipment and short-acting barbiturates when Xylocaine is administered; (c) "overpromoting" Dr. Bowman and the physician-employees so that they no longer heeded the warnings actually given; (d) failing adequately to warn Dr. Bowman and the physician-employees that Xylocaine should not be administered in a two-percent solution to an eight-month-old child; (e) failing to file annual reports and unexpected-adverse-reaction reports with the FDA, as required by 21 C.F.R. Sec. 130.35(e) and (f) (1972);[2] (f) marketing a product that was defective because the manufacturer's failure to file the adverse-reaction reports pursuant to section 130.35(f) deprived the FDA of the information it needed to make an informed judgment concerning the conditions under which Xylocaine safely could be marketed; (g) failing to provide Dr. Bowman with adequate directions for computing a safe dosage of Xylocaine for an eight-month old infant; (h) failing to conduct studies adequate to determine what in fact would be a safe dosage for a child of Harrikah's age; and (i) failing to exercise reasonable care to monitor and investigate fully the adverse reactions associated with Xylocaine in order to determine the risks involved in the use of that drug.
 
 
 7
 After an eight-week trial, the case was submitted to the jury on "special questions." On January 10, 1980, the jury returned a verdict against Astra alone.[3] In response to the "special questions," see infra Part III, the jury found that Harrikah had suffered an adverse reaction to Xylocaine; that Astra had acted negligently in failing to file the annual and adverse-reaction reports required by subsections 130.35(e) and (f); that the failure to file these reports rendered Xylocaine a defective product; and that Astra's negligence and the product's defective nature were substantial factors in causing Harrikah's injury. The jury also found that Astra negligently had failed both to conduct adequate dosage studies and to monitor and investigate fully the clinical adverse-reaction experiences, but it did not deem this negligence to have been a substantial factor in causing the child's injuries. Finally, the jury rejected plaintiffs' claims that Astra had failed to issue adequate warnings to users of Xylocaine; that Astra had "overpromoted" those users; and that Astra had failed to provide adequate directions to the users. The jury awarded Mrs. Brooks $60,000 in her own right and $255,000 on behalf of her daughter but refused to award punitive damages, finding that Astra had not acted "with a bad motive or with reckless indifference to the interests of persons who might be administered the drug." The district court entered judgment on the verdict on January 11, 1980.
 
 
 8
 Before the district court had ruled on post-trial motions, the Pennsylvania Supreme Court decided the case of Kaczkowski v. Bolubasz, 491 Pa. 561, 421 A.2d 1027 (1980), which held that a jury may consider lost future productivity in awarding damages for future losses and that such losses should not be discounted to present value. In the wake of this change in Pennsylvania law, the district court granted plaintiffs' motion for a new trial on compensatory damages but denied it in all other respects.[4] Stanton v. Astra Pharmaceutical Products, Inc., Civ. No. 73-610 (M.D.Pa. Oct. 19, 1981) ("Stanton I "). The court denied Astra's motion in toto. Stanton v. Astra Pharmaceutical Products, Inc., Civ. No. 73-610 (M.D.Pa. Oct. 19, 1981) ("Stanton II ").[5]
 
 
 9
 The new trial on compensatory damages resulted in a jury verdict awarding Mrs. Brooks $256,000 in her own right and $1,652,371 as Harrikah's parent and guardian. The court awarded damages for delay and molded the award to $2,367,032, pursuant to Pa.R.Civ.P. 238.[6] On April 14, 1982, Astra moved for a new trial, claiming that the district court had erred (a) in refusing to dismiss the panel of jurors after the court made allegedly improper remarks in its introductory statement to the panel, and (b) in refusing to declare a mistrial following allegedly improper and prejudicial statements by plaintiffs' counsel in his opening and closing arguments.[7] The court denied Astra's motion, Stanton v. Astra Pharmaceutical Products, Inc., Civ. No. 73-610 (M.D.Pa. June 28, 1982) ("Stanton III "), and Astra appealed. Plaintiffs filed a cross-appeal on August 6, 1982, challenging the court's denial of their motion for a new trial on punitive damages.
 
 
 10
 We now turn to the merits of the various claims raised on appeal, focusing primarily on those relating to the sufficiency of the evidence to support the verdict on liability, the court's resubmission to the jury of the "special questions" used during the first full trial, and the propriety of the granting of a new trial on damages alone. In a final section, we will consider more summarily the propriety of the remarks made by plaintiffs' counsel as well as plaintiffs' claims of error relating to the denial of punitive damages.[8]
 
 II. Sufficiency of Evidence of Liability
 
 11
 The verdict in plaintiffs' favor was predicated upon the jury's conclusion that Astra had acted improperly when it failed to file with the FDA the annual and adverse-reaction reports required by 21 C.F.R. Sec. 130.35(e) and (f) (1972). Astra initially argues that section 130.35 does not apply to Xylocaine and that the company therefore had no obligation to file any of the specified reports. But even assuming that the regulation does apply, Astra contends, the company did not act negligently when it decided not to file the requisite reports, and the failure to file therefore did not render Xylocaine defective or unreasonably dangerous. Moreover, Astra argues, even if a jury could find that the company either had acted negligently in failing to file the reports or had marketed a defective product, neither the negligence nor the section-402A violation could have been a substantial factor in causing Harrikah's injuries.
 
 
 12
 We first will consider the question of the applicability of section 130.35; in the course of our discussion, we will outline the rather complex statutory and regulatory schema governing marketed drugs. Because we conclude that Astra had a duty to file the reports required by section 130.35, we then will proceed to the consequences of noncompliance. The jury determined that noncompliance with the FDA's regulations engendered liability based on negligence as well as strict liability under Restatement (Second) of Torts Sec. 402A (1965). We will discuss separately each basis of liability. We conclude that the jury had sufficient evidence to find that Astra's conduct was negligent per se and that such conduct proximately caused Harrikah's injuries; we further conclude that the jury could find that Xylocaine was a defective product within the meaning of section 402A and that the defective product also was a proximate cause of the harm.[9]
 
 A. Applicability of 21 C.F.R. Sec. 130.35
 
 13
 In 1938, Congress enacted the Federal Food, Drug and Cosmetic Act, which prohibits the introduction into commerce of any "new drug" for which a new-drug application has not been filed with and approved by the FDA.[10] See Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, 612-15, 93 S.Ct. 2469, 2474-76, 37 L.Ed.2d 207 (1973). Pursuant to this Act, Astra submitted to the FDA in 1948 an application for approval of its new anesthetic, Xylocaine. The FDA approved Astra's application on November 19, 1948; marketing of Xylocaine in 0.5%, 1%, and 2% solutions commenced in 1949.
 
 
 14
 The Thalidomide tragedies of the early 1960s triggered the next wave of drug-related legislation: the Drug Act Amendments of 1962, 76 Stat. 780 (1962). It is these amendments with which we are principally concerned. Central to the amendments was section 103(a), which provides in relevant part:
 
 
 15
 In the case of any drug for which an approval of an application filed pursuant to this section is in effect, the applicant shall establish and maintain such records, and make such reports to the Secretary, of data relating to clinical experience and other data or information, received or otherwise obtained by such applicant with respect to such drug, as the Secretary may by general regulation, or by order with respect to such application, prescribe on the basis of a finding that such records and reports are necessary in order to enable the Secretary to determine, or facilitate a determination, whether there is or may be ground for invoking subsection (e) of this section ....[11]
 
 
 16
 21 U.S.C. Sec. 355(j)(1) (1976).[12] Pursuant to this authorization, the Secretary promulgated regulations on May 28, 1964. These regulations, as we noted above, require companies marketing registered drugs to submit to the FDA annual reports, 21 C.F.R. Sec. 130.35(e) (1971),[13] as well as immediate reports of all unexpected adverse reactions to those drugs, id. Sec. 130.35(f).[14]
 
 
 17
 Between May 28, 1964, and the end of 1970, Astra received 202 reports of adverse reactions allegedly related to Xylocaine.[15] These reactions ranged from minor, temporary effects to death. Yet Astra forwarded none of these reports to the FDA, relying upon the advice of its counsel, Alan H. Kaplan, that Xylocaine was not a "new drug"[16] and therefore was exempt from the reporting requirements embodied in 21 C.F.R. Sec. 130.35(e) and (f).[17] However, the company prepared the reports and made them a part of the Establishment Inspection Reports seen by non-medical FDA inspectors who came to inspect Astra's facilities between 1964 and 1971.
 
 
 18
 In deciding not to file the reports ostensibly required by section 130.35, Astra also relied on a letter, dated October 2, 1963, from John F. Palmer, M.D., the Chief of the Department of Health, Education and Welfare's ("HEW's") New Drug Status Branch, in which Dr. Palmer advised Astra that two-percent Xylocaine was "not now regarded" by the Division of Drugs as a "new drug" within the meaning of 21 U.S.C. Sec. 321(p), see supra note 16. App. at A559. On April 25, 1968, however, Arthur M. West, M.D., Acting Director of HEW's Division of Surgical Dental Drugs and Adjuncts, wrote to Astra and requested that the company file all reports prescribed in regulations promulgated pursuant to 21 U.S.C. Sec. 355(j).[18]
 
 
 19
 Upon receipt of this letter, Astra wrote back and reminded the FDA of both the 1963 letter from Dr. Palmer and the FDA's announcement on September 12, 1964, postponing the effective date of Sec. 130.35(b)'s reporting requirements, see 29 Fed.Reg. 12,872 (1964). Dr. West responded in July 1969 by referring Astra to a statement published in the Federal Register on May 20, 1968, in which the FDA formally had revoked "all opinions previously given by the [FDA] to the effect that an article is 'not a new drug' or is 'no longer a new drug.' "[19] Dr. West further informed Astra that, "since these drugs are presently under review by the National Academy of Sciences-National Research Council ["NAS-NRC"], we are deferring any final decision on the new drug status until the findings of the review are published."[20] Letter from Arthur M. West, M.D., to Astra (July 30, 1969), App. at A572. Thus, Astra knew, or should have known, by May 20, 1968, three and one-half years before Harrikah Stanton's adverse reaction, that the FDA deemed Xylocaine to be a "new drug" for purposes of compliance with the reporting requirements of 21 U.S.C. Sec. 355(j) and 21 C.F.R. Sec. 130.35.
 
 
 20
 Despite the above exchanges between Astra and the FDA, Astra contends that 21 U.S.C. Sec. 355(j) and 21 C.F.R. Sec. 130.35(f) apply only to "new drugs," see supra note 16 (defining "new drug"), and not to "old drugs," or drugs that are generally recognized by experts as safe and effective; Astra further claims that Xylocaine had achieved such recognition by 1964. The district court disagreed and, in a pretrial order, granted plaintiffs' partial motion for summary judgment "to the extent that the court concludes that the regulation 21 C.F.R. Sec. 130.35 ... was applicable to Astra ... as sponsor of the drug Xylocaine." Stanton v. Astra Pharmaceutical Products, Inc., Civ. No. 73-610 (M.D.Pa. Oct. 10, 1979) (Order).
 
 
 21
 We agree with the district court's ruling, for the very language of section 130.35 does not admit of the exclusion urged by Astra. Section 130.35 applies to "[e]ach applicant for whom a new-drug application or supplement ... became effective or was approved at any time prior to June 20, 1963 ...." 21 C.F.R. Sec. 130.35(a), (b) (emphasis added). This language appears to encompass Xylocaine, which was approved by the FDA in 1948. Moreover, application of section 130.35 to a drug approved in 1948 would seem essential in light of the FDA's statutory obligation continually to monitor drugs already on the market in order to determine whether to withdraw FDA approval pursuant to 21 U.S.C. Sec. 355(e).[21]
 
 
 22
 Astra relies both on the 1963 letter from the FDA, see supra, in which the agency advised Astra that it did not consider Xylocaine to be a new drug, as well as on the FDA's 1964 suspension of the effectiveness of certain regulations pending the resolution of a court challenge, see 29 Fed.Reg. 12,872 (1964). But neither the 1963 letter nor the 1964 suspension can avail Astra. While we concede that Astra initially was entitled to rely on the 1963 letter, the FDA effectively nullified the assertions contained in that letter when it announced in 1968, well before Harrikah Stanton's bone-marrow test in 1971, that "all opinions previously given by the [FDA] to the effect that an article is 'not a new drug' or is 'no longer a new drug' are hereby revoked," 33 Fed.Reg. 7758 (1968), see supra note 19. And as for the 1964 suspension: that declaration stayed the enforcement of only 21 C.F.R. Sec. 130.35(b), without any mention of subsections 130.35(e) and (f). Moreover, Astra does not appear to contend that it filed with the FDA the information required in order to qualify for the postponement of section-130.35(b) obligations.
 
 
 23
 Astra also argues that it had no obligation to file the adverse-reaction reports with the FDA because section 130.35(f) applies only to unexpected adverse reactions, and the reactions reported to Astra were not unexpected. The regulations define "unexpected" as
 
 
 24
 conditions or developments not previously submitted as part of the new-drug application or not encountered during clinical trials of the drug, or conditions or developments occurring at a rate higher than shown by information previously submitted as part of the new-drug application, or than encountered during such clinical trials.
 
 
 25
 21 C.F.R. Sec. 130.13(b)(2)(i). Thus, Astra would argue that the FDA already had been apprised of all relevant information and that it was not necessary to add to that data base.
 
 
 26
 This argument must fail as well. Astra itself contended before the district court that the character of those reactions was a question of fact for the jury. Despite the grant of summary judgment in favor of plaintiffs as to the applicability of section 130.35(f), the district court clearly submitted the question of expectedness to the jury, Transcript, vol. 30, at 114-15, and the jury resolved it adversely to Astra in finding that Astra should have filed the reports. In examining the district court's denial of Astra's motion for judgment n.o.v., we must view the record in this case in the light most favorable to plaintiffs and affirm the judgment unless the record lacks even that minimum quantum of evidence on which a jury reasonably might have based its verdict. Black v. Stephens, 662 F.2d 181, 187-88, 190 (3d Cir.1981), cert. denied, 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876 (1982). We certainly cannot say that no rational jury could have believed the reports received by Astra to have related to unexpected adverse reactions. Moreover, it does not appear from the record that Astra previously had informed the FDA of the full import of the adverse reactions reported to Astra during the 1960s.
 
 
 27
 Accordingly, we conclude that the district court did not err in ruling that subsections 130.35(e) and (f) applied to Astra; to the extent that the jury decided, in reaching its finding of liability, that the unreported adverse reactions were "unexpected," its verdict is supported. We now turn to the bases on which the jury found Astra liable.
 
 B. Liability Based on Negligence
 
 28
 1. Was Astra Negligent?
 
 
 29
 Under Pennsylvania law, the violation of a governmental safety regulation constitutes negligence per se if the regulation "was, in part, intended to protect the interest of another as an individual [and] the interest of the plaintiff which was invaded ... was one which the act intended to protect."[22] Majors v. Brodhead Hotel, 416 Pa. 265, 268, 205 A.2d 873, 875 (1965); accord Frederick L. v. Thomas, 578 F.2d 513, 517 (3d Cir.1978); Hunziker v. Scheidemantle, 543 F.2d 489, 497 (3d Cir.1976); Millard v. Municipal Sewer Authority, 442 F.2d 539, 541 (3d Cir.1971); D'Ambrosio v. City of Philadelphia, 354 Pa. 403, 405-07, 47 A.2d 256, 258-59 (1946). Astra cannot seriously dispute that section 130.35 was promulgated to protect individuals such as Harrikah Stanton from precisely the type of harm that here occurred--an unexpected adverse reaction to Xylocaine. It thus would appear that Astra's failure to file the reports constituted negligence per se.[23]
 
 
 30
 Astra points out, however, that noncompliance with safety regulations does not result inexorably in a finding of negligence because Pennsylvania law appears to follow the Restatement (Second) of Torts in recognizing a class of "excused violations."[24] In particular, Astra argues that its failure to comply with the applicable statutes and regulations is excused by three circumstances: (1) Astra neither knew nor should have known of the need to comply; (2) Astra's counsel advised the company that there was no need to file the reports with the FDA; and (3) the reports actually had been prepared and were available to FDA plant inspectors. We agree that Pennsylvania law allows a defendant to offer excuses for a statutory or regulatory violation; however, the record permitted the jury to reject each of the excuses proffered by Astra.
 
 
 31
 First, even assuming that Astra at one time had reason to believe that 21 C.F.R. Sec. 130.35 did not apply to Xylocaine, the FDA formally revoked in 1968 all previous opinions as to new-drug status and expressly informed Astra in 1969 that the FDA expected compliance with section 130.35. Thus, at least as of 1968, Astra knew, or should have known, that the FDA expected Astra to file the reports prescribed by section 130.35.
 
 
 32
 Second, the mere fact that Astra's attorneys interpreted section 130.35 incorrectly does not negate Astra's negligence in failing to comply with the regulations. Astra took a chance, and it is liable for the consequences of its acts. And even assuming that advice of counsel does constitute a legally cognizable excuse, that excuse could insulate Astra from liability only between the time that the FDA promulgated the regulations in 1964 and the time that the agency revoked all private letter-rulings as to new-drug status in 1968. Astra still had three and one-half years before the December 1971 tragedy to file the reports.
 
 
 33
 Nor can we accept the availability of the reports to plant inspectors as an excuse for Astra's conduct. Plant inspectors are not physicians and do not possess the expertise necessary to facilitate a full evaluation of the reports. Indeed, the jury heard testimony from Dr. Alan K. Done, a Professor of Pediatrics and Pharmacology who had served as Special Assistant to the Director of the FDA's Bureau of Drugs, that "it's not likely that [FDA field investigators] would go and look at those reports." Transcript, vol. 6, at 78. Moreover, the statute requires that manufacturers file reports with the FDA, 21 U.S.C. Sec. 355(j)(1), and make them available to inspectors, id. Sec. 355(j)(2), see supra note 12. It is no answer to say that compliance with section 355(j)(2) excuses a breach of section 355(j)(1).
 
 
 34
 Under Pennsylvania law, therefore, this case falls within section 288B(1) of the Second Restatement: "The unexcused violation of a legislative enactment or an administrative regulation which is adopted by the court as defining the standard of conduct of a reasonable man, is negligence in itself." The jury therefore had sufficient evidence upon which to find that Astra had acted negligently in failing to file the reports required by section 130.35.[25]
 
 
 35
 2. Did the Negligence Proximately Cause the Harm?
 
 
 36
 That Astra was negligent in failing to file the reports is not in itself sufficient to sustain the finding that Astra was liable. The negligence must also have been a proximate cause of Harrikah Stanton's injury.
 
 
 37
 It is well established in Pennsylvania that in order to find that defendant proximately caused an injury it must be found that his allegedly wrongful conduct was a substantial factor in bringing about plaintiff's injury even though it need not be the only factor. [Citations omitted.] It is equally well established that defendant's negligent conduct is not a substantial factor in bringing about plaintiff's injury if it would have been sustained even if the actor had not been negligent.
 
 
 38
 Majors v. Brodhead Hotel, supra, 416 Pa. at 271-72, 205 A.2d at 877; accord Hunziker v. Scheidemantle, supra, 543 F.2d at 496, 498; Greiner v. Volkswagenwerk Aktiengesellschaft, 429 F.Supp. 495, 496-97 (E.D.Pa.1977); Kaplan v. Philadelphia Transportation Co., 404 Pa. 147, 149-50, 171 A.2d 166, 167-68 (1961); Restatement (Second) of Torts, supra, Secs. 431-32. The next question, then, is whether plaintiffs introduced sufficient evidence to support the jury's determination that Astra's failure to file the annual and adverse-reaction reports had been a substantial factor in causing Harrikah's injury.[26]
 
 
 39
 In order to establish the requisite causal link between Astra's tortious conduct and Harrikah's injury, plaintiffs relied heavily on the testimony of Drs. Alan K. Done, Henry L. Price, Marvin Seife, and John Adriani.
 
 
 40
 Dr. Done, at the time of the trial, was a Professor of Pediatrics and Pharmacology and Adjunct Professor of Pharmacy at Wayne State University, as well as Director of the Division of Clinical Pharmacology and Toxicology at Children's Hospital of Michigan. Author of 300 articles, Dr. Done was certified by the American Board of Pediatrics and the American Board of Medical Toxicology. From 1972 to 1975, he served as Special Assistant to the Director of the FDA's Bureau of Drugs. Dr. Done testified that he had reviewed the adverse-reaction reports received by Astra between 1964 and 1970 and had found descriptions of twenty-two fatalities, thirteen near-fatalities,[27] twenty-five life-threatening incidents, and forty-five "unknown or nil life threat" instances among the medical cases. Transcript, vol. 4, at 169-70. The dental cases revealed four fatalities, four near-fatalities, thirty-five life-threatening cases, and 152 "unknown or nil threat to life" cases. Id. at 170. Dr. Done observed that the more severe reactions and problems had not necessarily arisen during the more complicated medical or dental procedures; in fact, "[t]he bulk of cases [involved] actually trivial procedures, relatively trivial procedures," id. at 170-71.
 
 
 41
 Plaintiffs' counsel questioned Dr. Done about the issue of causation:
 
 
 42
 Q. Now Doctor, based on your review of xylocaine's adverse reaction experience as reported in the yellow books, do you have an opinion as to whether or not the information Defendant, Astra received if not reported to the FDA would bias an evaluation of the safety of xylocaine?
 
 
 43
 ....
 
 
 44
 A. For clarification, do you mean by received, those that they received as physician or pharmacist complaints?
 
 
 45
 Q. Yes, sir.
 
 
 46
 ....
 
 
 47
 A. With that clarification my opinion is that this would seriously hamper the ability of a regulatory agency to carry out its responsibility.
 
 
 48
 Id. at 145-46. Later, Dr. Done testified that, "as part of the issue of reacting adequately to their own adverse reactions, action was called for earlier than it was taken. Action either by the company or by FDA. The FDA was denied that opportunity by virtue of being denied that information." Id., vol. 5, at 158. Dr. Done reiterated this point still one more time:
 
 
 49
 Q. Now, if the adverse reaction reports that have been introduced into evidence and to which you had testified, if those reports had been filed by Astra prior to December 2nd, 1971 would there have been an increased chance of some investigation by the FDA as opposed to the fact that one field investigator may have seen the reports at the Astra plant?
 
 
 50
 ....
 
 
 51
 [A.] The question [sic] is absolutely yes.
 
 Id., vol. 6, at 82-83.[28]
 
 52
 Dr. Done also explained two ways in which knowledge of Xylocaine's propensities could have been disseminated to the medical community, had Astra filed the requisite reports. First, Dr. Done discussed the "package insert," a sheet of instructions and warnings that manufacturers package together with the drug. Dr. Done testified that the FDA may order changes in the package inserts; these changes would inform physicians of new or previously unreported developments relating to Xylocaine. Id., vol. 5, at 134-35. The FDA must also approve the package inserts. Id. at 135.
 
 
 53
 The second means of dissemination would have been via the Physicians' Desk Reference ("PDR"), a manual containing information about thousands of marketed drugs and a basic reference tool for physicians. The PDR is supplemented annually and contains the "minimum" information needed for safe and effective administration of a drug. Id. at 161-63; see also id., vol. 9, at 73 (PDR is one of the best ways for manufacturers to communicate with doctors) (Testimony of Dr. Henry L. Price). According to Dr. Done, the PDR cannot contain any information that differs significantly from that approved by the FDA for inclusion in the package insert. Id., vol. 5, at 160. Moreover, Dr. Done noted, "[a]nything that was in the PDR was in the insert after 1968." Id. at 161. Thus, the jury heard evidence that, had Astra provided the FDA with the information about Xylocaine, the agency could have ordered revision of the package insert, and the updated information also would have appeared in the PDR or one of its annual supplements.
 
 
 54
 Dr. Henry L. Price, a board-certified Professor of Anesthesiology at Hahnemann Medical College in Philadelphia and a senior examiner for the American Board of Anesthesiology, also testified regarding the impact of Astra's overall course of conduct:
 
 
 55
 I think that Astra's failure to admit that their drug could cause reactions, which, in fact they did fail to do was responsible in this case for the outcome, including the brain damage because these people who gave the drug were not permitted to know what the experience of Astra was with respect to their own drug because they didn't communicate to the medical community that there could be reactions with this low a dosage. Therefore the people who gave the drug were not aware of what could happen and therefore didn't take precautions which in this case would have obviated the difficulty.
 
 
 56
 Id., vol. 9, at 62. While Dr. Price did not, in terms, speak specifically of Astra's failure to file reports with the FDA, the jury could have so interpreted his testimony and further could have concluded that, had the FDA been properly informed, it would have required notice via the package insert or PDR of the possibility of reactions from low dosage.
 
 
 57
 Counsel for plaintiffs also read into the record excerpts from the deposition of Dr. Marvin Seife, a long-time FDA employee who had held such positions as Executive Director of Medical Activities in the Office of Scientific Evaluation, Acting Associate Director for Marketed Drugs, and Deputy Director of the Division of Supplement Review in the Office of Drug Surveillance. During the course of the deposition, Dr. Seife was asked:
 
 
 58
 "Q. [I]f you had incomplete adverse reaction experience [from a company and its affiliates], would you have been in a position to make an informed judgment with respect to the safety of the drug?
 
 
 59
 ....
 
 
 60
 What I am trying to get at is, were they [the reports] an important factor in making a determination whether a drug was safe or not?
 
 
 61
 A. Yes.
 
 
 62
 Q. Or whether labeling revisions were required?
 
 
 63
 A. Yes."
 
 
 64
 Id. at 289-90.
 
 
 65
 Finally, plaintiffs called Dr. John Adriani, Professor of Pharmacology and Anesthesiology at Louisiana State University, Emeritus Professor at Tulane University, Emeritus Director and former chairman of the Department of Anesthesiology at Charity Hospital in New Orleans, former chairman of the American Medical Association's Council on Drugs, and author of some 600 articles. Dr. Adriani also served as chairman of the FDA's Respiratory and Anesthetic Drugs Advisory Committee and as a member of and then consultant to the FDA's Advisory Committee. The direct examination of Dr. Adriani concluded as follows:
 
 
 66
 Q Doctor, do you have an opinion to a reasonable medical certainty with respect to whether the absence of [adverse-reaction] reports would bias an evaluation of safety of any drug?
 
 
 67
 ....
 
 
 68
 A ... You mean if they failed to submit these drug reports; is that what you mean?
 
 
 69
 Q Yes, sir.
 
 
 70
 A Would that bias [an] evaluation of a drug?
 
 
 71
 Q Yes.
 
 
 72
 A Yes.
 
 
 73
 Transcript, vol. 26, at 156.
 
 
 74
 In short, plaintiffs attempted to establish causation by introducing evidence tending to show that the information withheld from the FDA was of great importance and that the agency could not properly perform its regulatory and supervisory roles without access to the unreported data, and that the FDA would have taken action had it been aware of Xylocaine's propensity to cause adverse reactions despite low dosage. Moreover, it was clear that Xylocaine had caused Harrikah's injuries: the jury found that Harrikah Stanton had experienced an adverse reaction, and Astra has never seriously argued that Xylocaine was not a "substantial factor" in causing that reaction.
 
 
 75
 Astra contends, however, as it did before the district court, see Stanton II, supra, slip op. at 8-11, that the evidence adduced by plaintiffs cannot support the jury's conclusion that the failure to file the reports was a substantial factor in causing Harrikah's injury because no witness stated expressly that, had those reports been filed, the FDA would have taken some action that would have saved this particular child from harm. It is true that the record does not contain such a statement, and that plaintiffs' evidence of causation is not very strong. On this point, the case thus is an extremely close one.[29] However, in evaluating the sufficiency of the evidence and the district court's denial of Astra's motion for judgment n.o.v., we are mindful that
 
 
 76
 our role ... is necessarily a limited one. As we stated in [Huddell v. Levin, 537 F.2d 726 (3d Cir.1976) ], " 'The Seventh Amendment bars appellate review of facts found by a jury in actions at common law....' " 537 F.2d at 736 (quoting 9 C. Wright & A. Miller, Federal Practice and Procedure Sec. 2571, at 681 (1971)). Thus, we are admonished to review the record in this case in the light most favorable to the non-moving party ... and to affirm the judgment of the district court denying the motions unless the record "is critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief." Denneny v. Siegel, 407 F.2d 433, 439 (3d Cir.1969); accord, Huddell, 537 F.2d at 737.
 
 
 77
 Dawson v. Chrysler Corp., 630 F.2d 950, 959 (3d Cir.1980), cert. denied, 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981); accord Chuy v. Philadelphia Eagles Football Club, 595 F.2d 1265, 1273 (3d Cir.1979) (in banc).
 
 
 78
 The jury heard the testimony of four well qualified expert witnesses. They heard from these witnesses an analysis of the numerous adverse-reaction reports received by Astra, some of which described incidents of cardiac and respiratory arrest, see, e.g., Transcript, vol. 4, at 193-94. They heard express testimony from these witnesses that Astra's conduct deprived the FDA and the medical community of important information, the lack of which would bias an evaluation of the safety of Xylocaine, and they heard testimony (e.g., from Dr. Price) from which they could infer, keeping in mind the FDA's statutory duty continually to monitor marketed drugs for safety and effectiveness: (1) that had the FDA had these reports, it would have required notice to the medical community (through the package insert or PDR) of the critical information contained in the more than 200 adverse-reaction reports of the incidence of cardiac and respiratory arrest, notwithstanding low dosage of Xylocaine; and (2) that physicians receiving this information would have considered it in deciding how--and whether--to administer Xylocaine to their patients.[30] Resolving every inference in plaintiffs' favor, we cannot conclude that the record was devoid of the requisite minimum quantum of evidence supporting the verdict.
 
 C. Strict Liability Under Section 402A
 
 79
 Under Restatement (Second) of Torts Sec. 402A, strict liability attaches when a "defective product," sold in an "unreasonably dangerous condition," causes an injury.[31] As we noted above, the jury found that Astra's failure to file the required reports rendered Xylocaine a defective product within the meaning of section 402A and that the defect proximately caused Harrikah's injury.[32] We first consider whether the finding that whether the finding that Xylocaine was a defective product can be sustained as a matter of law; we then proceed to the question of proximate cause.
 
 
 80
 1. Was Xylocaine a Defective Product?
 
 
 81
 Plaintiffs' theory of strict liability is that the federal regulatory scheme creates an expectation on the part of the ordinary user of Xylocaine that the FDA would allow the continued marketing of the drug only after evaluating the information contained in reports required by regulations such as 21 C.F.R. Sec. 130.35. By failing to file those reports, plaintiffs assert, Astra deprived the FDA and Harrikah Stanton's doctors of important information that people such as plaintiffs would have expected the agency and the physicians to have received and considered. Accordingly, the argument goes, the drug therefore was defective because it left "the seller's hands ... in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him," Sec. 402A comment g; moreover, Xylocaine was "unreasonably dangerous" because it caused adverse reactions of which the FDA never learned and therefore was "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics," id. comment i.[33]
 
 
 82
 We have been unable to uncover any statement of Pennsylvania law that directly resolves plaintiffs' contentions; we therefore must predict what a Pennsylvania court would do if confronted with the facts before us, see Becker v. Interstate Properties, 569 F.2d 1203, 1205-06 (3d Cir.1977), cert. denied, 436 U.S. 906, 98 S.Ct. 2237, 56 L.Ed.2d 404 (1978). The closest indication of Pennsylvania law derives from the fact that an apposite California case, Toole v. Richardson-Merrell Inc., 251 Cal.App.2d 689, 60 Cal.Rptr. 398 (1967), was cited approvingly by the Pennsylvania Superior Court in Berkebile v. Brantly Helicopter Corp., 225 Pa.Super. 349, 355, 311 A.2d 140, 143 (1973), aff'd, 462 Pa. 83, 337 A.2d 893 (1975). In Toole, the California Court of Appeals confronted a section-402A claim similar to the one now before us and upheld a jury verdict holding a drug company strictly liable for injuries sustained by a plaintiff where the company had violated reporting provisions of the Food, Drug and Cosmetic Act. Plaintiff had used the drug Triparanol (designed to treat arteriosclerosis), sold under the trade name "MER/29," and had developed cataracts in both eyes; Richardson Merrell's new-drug application had not disclosed the full extent of the company's knowledge regarding similar effects. Finding that the statutory violations rendered Triparanol a defective product because improperly prepared and marketed, the court declared:
 
 
 83
 In light of the non-disclosure of significant facts which, if known to the FDA, would have enabled its scientists to make a more critical analysis of [the drug], it can hardly be said that the FDA's permission to market the drug was an informed judgment, based on all the known facts, or that it was uninfluenced by [defendant's] non-disclosure.
 
 
 84
 60 Cal.Rptr. at 413.
 
 
 85
 We believe, given recent trends in Pennsylvania's law of strict liability, see, e.g., Azzarello v. Black Brothers Co., supra note 31, that a Pennsylvania court would agree with this formulation as an ingredient of section-402A liability, and that it would impose section 402-A liability where the fact finder concluded that the FDA would have, if the missing data had been disclosed, required dissemination to the medical community of the now disclosed facts. We note in this regard that what, in the negligence context, is proximate cause analysis, is collapsed into the elements of liability for defective product. See note 35, infra.
 
 
 86
 We conclude that a Pennsylvania court applying Pennsylvania law would allow a jury to determine on the facts of this case that Xylocaine was a defective product within the meaning of section 402A. First, plaintiffs adduced evidence that, by failing to comply with 21 C.F.R. Sec. 130.35, Astra deprived the FDA and, derivatively, the medical community at large of important information relating to the dangerousness of Xylocaine and that, without such information, the FDA could not make the professional and medical judgments that reasonable consumers rightfully expected it to make as a precondition of permitting the continued marketing of Xylocaine. Second, although plaintiffs' evidence was not particularly strong, for the reasons stated in Part II.B.2, supra, we believe that plaintiffs presented sufficient evidence that the FDA would have acted had it received the unreported information. The district court therefore did not err in denying Astra's motion for judgment n.o.v. on this issue.[34]
 
 
 87
 2. Was the Defective Product a Proximate Cause?
 
 
 88
 Having established that a jury could have found Xylocaine a defective product under section 402A, we need say little about the issue of proximate cause.[35] Section 402A provides that a seller will be held strictly liable "when a defective product he has sold is the proximate cause of a user's injuries." Sochanski v. Sears, Roebuck & Co., supra, note 31, 621 F.2d at 69. As we noted above, see supra Part II.B.2, the jury found that Harrikah Stanton had experienced an adverse reaction to Xylocaine, see Special Question 1, and no one disputes the proposition that the adverse reaction caused the cardiac arrest and ensuing brain damage. The jury therefore could have found that the defective product, Xylocaine, was a "substantial factor" in causing Harrikah's injuries, and the district court properly denied judgment n.o.v. on the question of proximate cause.
 
 
 89
 III. Resubmission of Special Questions (Fed.R.Civ.P. 49)
 
 
 90
 At the conclusion of the 1979-80 trial, the jury retired to deliberate the answers to twenty-seven "special questions" prepared by the district court and counsel. Although it returned with an award in favor of plaintiffs, the award was inconsistent with the jury's answers to several of the "special questions."
 
 
 91
 The jury awarded the $315,000 in response to Special Question 26: "If you determine that any of the defendants are liable in damages to plaintiff, what compensatory damages do you award?" (Emphasis added.) A reasonable reading of that question suggests that any award necessarily would depend on a predicate finding of liability; as we already have discussed, see supra Part II, a finding of liability must subsume a finding of proximate cause. But in determining that Astra had been negligent in failing to file the reports required by section 130.35, see Special Questions 9(a) and 10(a), supra note 26, and that the failure to file the adverse-reaction reports rendered Xylocaine a defective product, see Special Question 11(a), supra note 32, the jury also found that neither the negligence nor the defective nature of the drug had been a substantial factor in causing Harrikah's injury, see Special Questions 9(b), 10(b), and 11(b), supra notes 26, 32. Thus, as the district judge observed, the jury apparently awarded damages "against no one." Transcript, vol. 31, at 26.
 
 
 92
 The jury compounded the confusion by answering "no" to Special Question 23:
 
 
 93
 If you determine that the negligence of, or sale of a defective product by, Astra and the negligence of Dr. Bowman were substantial factors in causing plaintiff's injuries, should Astra be relieved of liability because Dr. Bowman's negligence was so extraordinary as not to have been reasonably foreseeable by Astra?
 
 
 94
 A negative answer--or, for that matter, any answer at all[36]--assumes a predicate finding that both Astra and Dr. Bowman were liable; the "no" merely means that Dr. Bowman's conduct was not of the kind that should relieve Astra of its own liability. Thus, the jury's decision to answer this question, as well as the answer itself, were inconsistent with the answers to Special Questions 9(b), 10(b), and 11(b), but consistent with the award of damages in Special Question 26.[37]
 
 
 95
 Faced with this serious confusion, the trial judge resubmitted the questions to the jurors after explaining to them his reasons for so doing. After further deliberations, the jury changed its answers to several key questions:
 
 
 96
 1. The answer to 9(b) was changed from "no" to "yes," making Astra's failure to file the annual reports required by section 130.35(e) a substantial factor in causing Harrikah's injuries;
 
 
 97
 2. The answer to 10(b) was changed from "no" to "yes," making Astra's failure to file the adverse-reaction reports required by section 130.35(f) a substantial factor;
 
 
 98
 3. The answer to 11(b) was changed from "no" to "yes," making the defective nature of the drug a substantial factor; and
 
 
 99
 4. The answer to 23 was changed from "no" to "no answer," reflecting the fact that only Astra, and not Dr. Bowman, was liable for the injury.
 
 
 100
 These revised answers thus supplied a finding of liability to accompany the award of damages.
 
 
 101
 Astra argues, as it did before the district court, Stanton II, supra, slip op. at 3-8, that the district court erred in resubmitting the questions to the jury. Fed.R.Civ.P. 49,[38] Astra points out, provides for submission to a jury of two types of questions: questions submitted under Rule 49(a), which ask the jury only to find facts, rather than to apply the law to those facts and render a general verdict, and questions submitted under Rule 49(b), which, by contrast, merely accompany and clarify the general verdict rendered by the jury. There is no doubt that Rule 49(b) expressly authorizes resubmission of inconsistent answers to special interrogatories. But Astra asserts that the "special questions" used in this case were submitted to the jury under Rule 49(a), not 49(b), and that Rule 49(a) does not contemplate resubmission. Therefore, Astra contends, the court should not have resubmitted the questions but, rather, should have ignored the damages award and molded the verdict for Astra based on the initial finding that Astra was not liable for Harrikah's condition. Had the court so ruled, the case would have ended, and the decision in Kaczkowski v. Bolubasz, supra, would not have required a new trial either on damages or on anything else. Two questions thus arise: (1) Were the questions submitted pursuant to Rule 49(a) or 49(b)? (2) If the former, did the district court abuse its discretion in ordering resubmission?
 
 
 102
 A. Were the Questions Submitted Under Rule 49(a) or 49(b)?
 
 
 103
 In deciding whether the district court intended to submit the "special questions" under Rule 49(a) or 49(b), it behooves us to consider the court's own analysis of its actions:
 
 
 104
 In all candor, in framing the Special Questions, the Court did not consciously intend a Rule 49(a) submission as distinguished from Rule 49(b). It was an honest effort to insure that all issues would be addressed and resolved, including a determination of final liability, in the same manner as if a general verdict was implicated.
 
 
 105
 Stanton II, supra, slip op. at 3. After analyzing the content of the questions submitted, the court concluded that "[t]he format utilized here performed the function contemplated under 49(b)." Id. at 4. We agree.
 
 
 106
 As the district court accurately pointed out, Special Question 26 expressly asked the jury to make a finding of ultimate liability: "If you determine that any of the defendants are liable in damages to plaintiff, what compensatory damages do you award?" Special Questions 23, 24, and 25 also called upon the jury to render a general verdict:
 
 
 107
 If you determine that the negligence of, or sale of a defective product by, Astra and the negligence of Dr. Bowman [Question 23]/Dr. Fabian [Question 24]/ Harrisburg Hospital [Question 25] were substantial factors in causing plaintiff's injuries, should Astra be relieved of liability because Dr. Bowman's/Dr. Fabian's/Harrisburg Hospital's negligence was so extraordinary as not to have been reasonably foreseeable by Astra?
 
 
 108
 Moreover, the district court's charge reveals that the jury was being asked to consider legal as well as factual matters:
 
 
 109
 My charge will ... consist of the initial phase being kind of the general charge, that is, the law as it applies generally in all types of litigation, and then later on in the charge, I will get to the specifics of this particular case; the specifics principally as to the law to be applied because I don't expect to do any review of any significance of the ... evidence in the case ....
 
 
 110
 ....
 
 
 111
 So when I do make reference, as I will, to a particular factual issue or some contention by the parties or some evidence, it is merely to illustrate the legal principle involved ....
 
 
 112
 Transcript, vol. 30, at 82. The court continued:
 
 
 113
 [T]he defendants don't rise or fall together. And you can return a verdict in favor of plaintiff against all of the defendants or against one of the defendants or some of the defendants, or you can find in favor of all the defendants and against the plaintiff.
 
 
 114
 Id. at 84. The jury thus was on notice, from the very beginning of the charge, of its responsibility to render a general verdict on liability.
 
 
 115
 Rule 49(b) also requires the trial judge to "give such explanation or instruction as may be necessary to enable the jury both to make answers to the interrogatories and to render a general verdict ...." (Emphasis added.) We believe that the district court's charge complied with the mandate of Rule 49(b).
 
 
 116
 The court began the substantive portion of its charge by explaining to the jury the principles of negligence and proximate cause and also discussed the effect of violating a statute or regulation. Transcript, vol. 30, at 102-17. The jury was fully informed of the requirements of 21 C.F.R. Sec. 130.35 and told to determine whether it was reasonable for Astra not to file the reports either because of a legal excuse or because the adverse reactions therein described were not unexpected. Id. at 110-16. Next came instructions on strict liability and section 402A, id. at 117-19, 125-38, the consequences of a failure to provide proper and adequate warnings about Xylocaine's characteristics, id. at 119-28, and the principle of superseding cause, id. at 140-42. Finally, the court charged the jury on compensatory damages, id. at 142-48, reduction to present value, id. at 148-49, pain and suffering, id. at 149-51, and punitive damages, id. at 152-53. We are confident that these explanations and instructions provided an ample foundation upon which the jury could render a general verdict and answer the "special questions."
 
 
 117
 Accordingly, we conclude that the "special questions" submitted to the jury fit within the framework of Rule 49(b), and the district court therefore did not abuse its discretion when it resubmitted the inconsistent answers to the jury for clarification.
 
 B. Resubmission Under Rule 49(a)
 
 118
 Even accepting Astra's assertion that the "special questions" were propounded under Rule 49(a), however, we conclude that the district court retained the discretion to resubmit the questions to the jury and that the court did not abuse its discretion in doing so here. The language of the Rule in no way prohibits resubmission, and we see no reason in logic or policy so to distinguish between Rule-49(a) and Rule-49(b) questions.
 
 
 119
 Astra has pointed to only one case directly holding that a court may not resubmit to a jury questions propounded under Rule 49(a). See McCollum v. Stahl, 579 F.2d 869 (4th Cir.1978), cert. denied, 440 U.S. 912, 99 S.Ct. 1225, 59 L.Ed.2d 460 (1979).[39] The Court of Appeals for the Fifth Circuit has taken the opposite position and allows resubmission even under Rule 49(a). See Alverez v. J. Ray McDermott & Co., 674 F.2d 1037, 1040-41 (5th Cir.1982); Mercer v. Long Mfg. N.C. Inc., 671 F.2d 946, 947 (5th Cir.1982). We are persuaded that the Fifth Circuit has adopted the better view.[40] As that court declared in discussing the related question of the permissibility of submitting supplementary interrogatories in an attempt to harmonize responses to Rule-49(a) questions: "It would be anomalous to hold that, while a court pursuant to Rule 49(a) must search for a view of the case which will make the jury's answers consistent, it may not submit an additional interrogatory to the jury to clarify an ambiguity." Morrison v. Frito-Lay, Inc., 546 F.2d 154, 161 (5th Cir.1977).[41] Moreover, in purely pragmatic terms, it seems terribly inefficient not to obtain clarification from a still-empaneled jury of the meaning of its answers and verdict, especially when we consider that unclarified inconsistent answers often necessitate a retrial of the entire case. Accordingly, we hold that the district court did not abuse its discretion in resubmitting the "special questions" to the jury, whether those questions be deemed to have been propounded under Rule 49(a) or 49(b).
 
 IV. The Propriety of the Partial New Trial
 
 120
 When the Pennsylvania Supreme Court's decision in Kaczkowski v. Bolubasz, supra, changed the law of damages that had applied at the time the jury made its award in favor of plaintiffs, the district court granted a new trial limited only to damages. Stanton I, supra, slip op. at 2-5. Astra does not contest the necessity of recalculating damages but urges that the retrial also should have encompassed the question of liability.
 
 
 121
 It is clear that the Federal Rules of Civil Procedure provide for partial new trials, see Fed.R.Civ.P. 59(a); the only question is whether the district court abused its discretion in ordering one in this case.[42] The standard for determining whether it is proper to limit a new trial only to certain issues has long been established: "Where the practice permits a partial new trial, it may not properly be resorted to unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." Gasoline Products Co. v. Champlin Refining Co., 283 U.S. 494, 500, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1931). Reflecting on Gasoline Products, this Court has declared:
 
 
 122
 In the forty-six years since the decision in Gasoline Products, the judicial limitation on the power to grant partial new trials has retained its force. It has been read to prevent limited new trials where a tangled or complex fact situation would make it unfair to one party to determine damages apart from liability, 6A Moore's Federal Practice p 59.06 at 59-89 (1973), or where 'there is reason to think that the verdict may represent a compromise among jurors with different views on whether defendant was liable.' 11 C. Wright & A. Miller, Federal Practice and Procedure Sec. 2814 at 96 (1973) (footnotes omitted).
 
 
 123
 This circuit has consistently observed the stricture of Gasoline Products. For example, this court has required that partial new trials should be granted " 'only in those cases where it is plain that the error which has crept into one element of the verdict did not in any way affect the determination of any other issue.' " Romer v. Baldwin, 317 F.2d 919, 922-23 (3d Cir.1963), quoting Thompson v. Camp, 167 F.2d 733, 734 (6th Cir.), cert. denied, 335 U.S. 824 [69 S.Ct. 48, 93 L.Ed. 378] ... (1948). Accord, e.g., Darbrow v. McDade, 255 F.2d 610, 611 (3d Cir.1958).
 
 
 124
 Vizzini v. Ford Motor Co., supra note 42, 569 F.2d at 760; accord Heckman v. Federal Press Co., 587 F.2d 612, 619 (3d Cir.1978); see Leizerowski v. Eastern Freightways, Inc., 514 F.2d 487, 491 (3d Cir.1975).
 
 
 125
 On the facts of this case, we cannot say with assurance that the questions of liability and damages were so separable that the jury's determination of the one had no bearing on its determination of the other; rather, our review of the record strongly suggests that the first jury reached a verdict representing a compromise among jurors with different views as to whether Astra was liable. We therefore cannot assert that "allowing a second jury to determine the issue of damages in isolation from the whole of the circumstances surrounding the case was not an injustice to [Astra]." Vizzini v. Ford Motor Co., supra note 42, 569 F.2d at 761.
 
 
 126
 The most compelling indication that the first jury reached a compromise is a comparison between the damages awarded and the damages requested. The jury awarded plaintiffs a total of $315,000--$60,000 for Mrs. Brooks and $255,000 for Harrikah. This award, although described by the district court as "one of the highest ever recorded in this district in a personal injury action," Stanton I, supra, slip op. at 5, is fairly small compared to reported verdicts for similar injuries to similarly situated plaintiffs, of which awards we may take judicial notice, and was far smaller than the amount that plaintiffs' evidence might have supported.[43] Mrs. Brooks had adduced evidence of damages of $186,360, the sum obtained by multiplying $23,295 (the annual salary of a nurse) by the eight years that Mrs. Brooks, herself a nurse, had spent in caring for Harrikah since the 1971 injury; the jury awarded less than one-third of that sum. Plaintiffs also presented evidence that Harrikah had sustained damages greatly exceeding the $255,000 actually awarded: they sought $529,625 for fifty years' worth of home care,[44] $88,664 for therapy, and either $132,000 or $155,212 in lost earnings, depending on whether Harrikah were to have obtained a high-school or a college diploma. Moreover, Harrikah sought additional damages for pain and suffering. The jury thus awarded plaintiffs far less than the amounts requested.
 
 
 127
 Inconsistent answers to the other "special questions" further suggest that the verdict was a compromise. The answers were inconsistent among themselves and, in some cases, with the damage award itself. We already have described a number of these conflicts, see supra Part III;[45] there are other potential inconsistencies as well. For example, the jury found (after resubmission of the "special questions") that Astra had acted negligently in failing to file the various reports required by 21 C.F.R. Sec. 130.35 and that such negligence was a substantial factor in causing Harrikah's injury. But the jury also found that Astra had adequately warned the doctors of the possibility of toxic reactions to Xylocaine and had provided adequate directions for computing a safe dosage of the drug for an eight-month-old child.[46] While these various answers may be reconcilable with a finding of liability, see supra note 46, and thus do not undermine the verdict, they nevertheless suggest--at least in the context of the comparatively small damage award--that the jury might have had some reservations about imposing liability on Astra.
 
 
 128
 In short, there is a great deal of evidence that the jury was at odds, that it was temporizing, and that its solution was a compromise verdict. Under the circumstances, it was an injustice to Astra to retry the damages issue alone, and we therefore hold that the district court abused its discretion in so ordering.
 
 
 129
 Astra has requested that a new trial on liability be limited to the issues posed in Special Questions 9 through 11, supra notes 26, 32--whether Astra acted negligently in not filing the reports, whether the failure to file the reports rendered Xylocaine a defective product, and whether either Astra's negligence or the product's defective nature was a substantial factor in causing Harrikah's brain damage. We find such an approach inappropriate. Because we are remanding for a new trial, we believe that fairness to plaintiffs requires the liability question to be retried in toto. Plaintiffs therefore will have an opportunity to reintroduce evidence supporting their contentions, inter alia, that Astra failed adequately to warn the medical community of the dangers of Xylocaine, that Astra "overpromoted" the drug, and that Astra failed to conduct sufficient studies to determine a safe dosage of Xylocaine for a child of Harrikah's age.
 
 V. Miscellaneous Claims
 
 130
 We now consider in a more summary manner the remaining claims raised by Astra and plaintiffs. We realize that some of the problems raised by the various claims are obviated by our remanding the case for a full retrial, but, because of the age of the case and the likelihood that a number of these questions will recur, we will rule on the germane issues for the guidance of the court and counsel.
 
 A. Remarks of Counsel
 
 131
 Counsel for plaintiffs began his opening statement during the retrial on damages by labeling the case
 
 
 132
 probably one of the most important civil cases which has ever come before a jury in the United States of America. I think when you see its implications, that it's a test of our judicial system to see if a child who is at the lower end of our society, a person who is absolutely utterly helpless can come before a jury and receive fair and just compensation for the injuries which have been afforded to her.
 
 
 133
 Trial Transcript, vol. 1, at 49, Feb. 16, 1982. He then sketched for the jury a portrait of Mrs. Brooks, whose first husband was killed in Vietnam in the 1960's and whose second husband--Harrikah's father--was killed "as a victim of street crime" in January 1971, while Mrs. Brooks was pregnant with Harrikah. Id. at 52. Counsel also discussed Mrs. Brooks' third marriage, to a cement mason in Chattanooga, id. at 53, and described the Brooks home:
 
 
 134
 This is the type of home where children don't talk back to parents, where there is a certain amount of order. They see a father get up every morning at 7:30 and go off to work to provide for the children. There is a certain amount of order and you see the Brooks children, they care for their younger sister. This is not the type of family that some people like to see when they say the family is disintegrating. It is not disintegrating. It is, in fact, a rock of the type that most of us would like to belong to.
 
 
 135
 Id. at 54.
 
 
 136
 Finally, plaintiffs' attorney reached the question of plaintiffs' race:
 
 
 137
 [W]e were concerned about the effect of having black people come to an area where there are not many black people and expecting to get justice from a jury which is mostly white people. We decided to confront this issue and we asked you the questions this morning, and we were really pleased with the responses that we got and we think that this is an impartial jury and everyone here has sworn that they will try this case not on the basis of passions, or prejudice, or economic basis, but on the basis of the facts and the law.
 
 
 138
 Id. at 54-55. Astra contends that the above statements, taken together, unfairly prejudiced the jury and that the district court erred in denying Astra's motion for a mistrial.
 
 
 139
 Because we have held that the case must be remanded for a new trial, we need not resolve the question whether the district court should have declared a mistrial; were we to confront that issue, we would be inclined to hold that these remarks did not require a new trial because we would find it difficult to say that "it [was] more than 'reasonably probable' that the verdict was influenced by the prejudicial statements," Draper v. Airco, Inc., 580 F.2d 91, 97 (3d Cir.1978). However, we are not dealing with that question but, rather, with the propriety of the remarks. We hold that the statements go beyond the ambit of proper opening statement. See Government of Virgin Islands v. Turner, 409 F.2d 102 (3d Cir.1969), where we analyzed the legitimate functions of an opening statement, and stated that: "The purpose of an opening is to give the broad outlines of the case to enable the jury to comprehend it ...." Accordingly, the remarks should not be repeated in the opening statement at the retrial. We add that significant portions of the quoted remarks are, at all events, beyond the realm of appropriate advocacy. As we said in Draper, "there must be limits to pleas of pure passion and there must be restraints against blatant appeals to bias and prejudice." 580 F.2d at 95. Justice must not be based on racial sympathy or animosity.
 
 B. Plaintiffs' Claims
 
 140
 Plaintiffs contend that the district court unfairly prejudiced their ability to prevail on their claim for punitive damages by (1) allowing Astra to introduce evidence of FDA factory inspections to establish an excuse for the company's failure to file the reports required by 21 C.F.R. Sec. 130.35(e) and (f); (2) allowing Astra to introduce the testimony of its attorney, Alan Kaplan, concerning his interpretation of Astra's reporting obligations, in order to establish the reasonableness of Astra's failure to comply with the statute and regulations; and (3) refusing to admit into evidence, for the purpose of establishing statutory fraud and willful, wanton, and reckless conduct, two supplemental new-drug applications that Astra had submitted to the FDA in 1969.[47] While we have serious doubts that the evidence presented by plaintiffs would support an award of punitive damages, that question is not now before us; we will rule on plaintiffs' claims for the guidance of the district court, should plaintiffs pursue their punitive-damages claim on retrial. We agree with the district court's rulings on the first two points, but we hold that the court erred in excluding the 1969 applications.
 
 1. Evidence of Factory Inspections
 
 141
 The district court did not err in admitting evidence of the FDA's factory inspections, at least insofar as that evidence related to plaintiffs' claim for punitive damages. Fed.R.Evid. 401 establishes the standard for "relevant evidence": " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." (Emphasis added.) The "fact of consequence" here is whether Astra "engage[d] in outrageous conduct" or "act[ed] with a bad motive or with reckless indifference to the interests of persons who might be administered the drug," Special Question 15.
 
 
 142
 Under the circumstances, the evidence clearly was relevant and admissible as to the punitive-damages claim. In determining the motive with which Astra acted in failing to file the report, a jury certainly could take note of the fact that Astra apparently made the unreported adverse-reaction information available to FDA inspectors. Such conduct could be interpreted as inconsistent with plaintiffs' allegation that Astra was doing everything within its power to conceal from the world the true nature of Xylocaine. The evidence thus bears on the question whether Astra was acting in bad faith when it failed to file the requisite reports and therefore meets the criterion propounded in Rule 401.[48]
 
 2. Testimony of Counsel
 
 143
 We also agree that the testimony of Astra's attorney, Alan Kaplan, was admissible insofar as it related to the punitive-damages claim because such testimony bore upon the reasonableness of Astra's decision not to file the reports with the FDA.[49] Under Pennsylvania law, punitive damages may be awarded "only after consideration of the act itself, together with all the circumstances, including the motive of the wrong-doer, and the relations between the parties." Pittsburgh Outdoor Advertising Co. v. Virginia Manor Apartments, Inc., 436 Pa. 350, 353, 260 A.2d 801, 803 (1970) (emphasis added). In determining Astra's motive, we would think that a jury might consider why Astra did what it did, including whether the company acted on advice of counsel. Pennsylvania courts do not appear specifically to have addressed the question whether advice of counsel may be raised as a defense (albeit not an absolute one) to a claim for punitive damages, but a number of courts have held that "good faith reliance upon advice of counsel may prevent imposition of punitive damages," Henderson v. United States Fidelity & Guaranty Co., 695 F.2d 109, 113 (5th Cir.1983); accord Fox v. Aced, 49 Cal.2d 381, 317 P.2d 608, 610-11 (1957); see also 22 Am.Jur.2d Damages Sec. 253 (1965) (citing cases). We are persuaded by these decisions, and we predict that Pennsylvania law would allow a jury considering punitive damages to take into account the fact that Astra's lawyer told the company that there was no need to file with the FDA the reports specified in 21 C.F.R. Sec. 130.35. Counsel's testimony to that effect thus was properly admitted as relevant to the claim for punitive damages.
 
 3. 1969 Supplemental Applications
 
 144
 Finally, we come to plaintiffs' claim that the district court erred in excluding the two supplemental new-drug applications that Astra had submitted to the FDA in 1969. Astra had not included in these applications the reports of Xylocaine's adverse-reaction experience, despite the fact that such information was required by 21 C.F.R. Sec. 130.30 (1969), as amended by 32 Fed.Reg. 8087 (1967). Plaintiffs contend that these applications should have been admitted as evidence of a pattern of deception and willful concealment of vital information and that the exclusion of the applications unfairly prejudiced plaintiffs' ability to prevail on their punitive-damages claim. Astra, however, asserts that the applications were properly excluded because the filings "were submitted in error by the defendant, were withdrawn and were not acted upon by the FDA." Brief at 41.
 
 
 145
 We believe that the district court erred in excluding the 1969 applications. Contrary to Astra's protestations, the applications were "acted upon" by the FDA: the agency thoroughly reviewed the documents, see App. at A529-32, and responded by sending a five-page letter to Astra discussing labeling changes and safety warnings, Letter from John Jennings, M.D., to Astra (Aug. 18, 1969), App. at A533. It therefore is disingenuous for Astra to imply that the FDA did not take seriously the 1969 applications. Nor can Astra prevail by claiming that the applications were "submitted in error." Astra submitted them, even if mistakenly, in the regular course of business. They were not mailed surreptitiously to the FDA by a dissident employee harboring a grudge against the company, and we see no reason why Astra should not have to answer for the good-faith acts of its employees.
 
 
 146
 Moreover, we agree with plaintiffs that the applications would have been probative of Astra's "determination to thwart the law," Brief at 45. The jury could have considered the circumstances surrounding the 1969 applications as evidence of a larger, carefully planned scheme to hide unfavorable information. Such an interpretation would have rendered Astra's initial decision not to comply with section 130.35 just one more element in that scheme. Accordingly, we hold that the district court erred in excluding the 1969 applications, at least insofar as they related to plaintiffs' punitive-damages claim.
 
 VI. Conclusion
 
 147
 For the reasons stated above, we conclude that Astra had an obligation to file the reports required by 21 C.F.R. Sec. 130.35; that there was sufficient evidence to support the verdict in favor of plaintiffs; that the district court did not err in resubmitting the "special questions" to the jury; and that the court did not abuse its discretion in allowing Astra to introduce evidence of factory inspection and the testimony of its attorney, Alan Kaplan. We have also held that the court erred in excluding from evidence the 1969 supplemental applications, and that, even though the remarks of counsel during his opening statement might not have justified a mistrial, they were improper and should not be repeated on retrial. Finally, we conclude that the court abused its discretion in granting a retrial limited only to damages.
 
 
 148
 We therefore will vacate the judgment and remand for a new trial on liability and damages. During this new trial, plaintiffs will be free to pursue any and all theories and claims advanced during previous stages of the litigation.
 
 
 
 [1]
 Jurisdiction was founded on diversity of citizenship. See 28 U.S.C. Sec. 1332 (1976)
 
 
 [2]
 We discuss below the statutory and regulatory scheme in greater detail. See infra Part II.A. Briefly stated: 21 C.F.R. Sec. 130.35(e), infra note 13, requires the submission of annual reports containing information concerning, inter alia, side-effects, injuries, and sensitivity reactions that, "by kind, or incidence or severity," were not fully disclosed in the labeling of the drug. This section also mandates the filing of unpublished reports of clinical studies and experiences involving the drug at issue. Under 21 C.F.R. Sec. 130.35(f), infra note 14, a drug manufacturer must submit to the FDA "[a]s soon as possible, and in any event within 15 working days of its receipt by the [company]," complete records or reports of, inter alia, "information concerning any unexpected side effect, injury, toxicity, or sensitivity reaction or any unexpected incidence or severity thereof associated with clinical uses, studies, investigations, or tests, whether or not determined to be attributable to the drug ...." The above reporting requirements apply to any "new drug," infra note 16, for which a new-drug application remains in effect. Astra contends that Xylocaine is not a "new drug" and that the company was under no obligation to comply with Sec. 130.35. We address these arguments below, infra Part II.A
 
 
 [3]
 Prior to the entry of judgment on the verdict, plaintiffs received $482,500 from Harrisburg Hospital and Drs. Bowman and Fabian pursuant to a court-approved settlement agreement and joint-tortfeasor release
 
 
 [4]
 Because this case is a diversity action, the district court was required "to apply state law ... in accordance with the then controlling decision of the highest state court" "until such time as [the] case is no longer sub judice." Vandenbark v. Owens-Illinois Glass Co., 311 U.S. 538, 543, 61 S.Ct. 347, 350, 85 L.Ed. 327 (1941) (emphasis added). As we noted in Baker v. Outboard Marine Corp., 595 F.2d 176 (3d Cir.1979), "the [Supreme] Court recognized explicitly that the result of this rule would be that '[i]ntervening and conflicting [state court] decisions will thus cause the reversal of judgments which were correct when entered.' " Id. at 182 (quoting Vandenbark, supra, 311 U.S. at 543, 61 S.Ct. at 350). (The parties agree that Pennsylvania law controls.) Thus, the district court's reliance on Kaczkowski was entirely proper
 
 
 [5]
 Following the district court's rulings in Stanton I and Stanton II, supra, Astra petitioned the court to certify the orders for immediate appeal pursuant to 28 U.S.C. Sec. 1292(b) (1976). When the district court denied the motion on November 24, 1981, Astra filed with this Court a Petition for Leave to Appeal, Stanton v. Astra Pharmaceutical Prods., Inc., No. 81-8177 (3d Cir. Dec. 9, 1981). We denied the petition on December 23, 1981
 
 
 [6]
 Rule 238 must be applied in diversity cases by federal courts applying Pennsylvania law. Jarvis v. Johnson, 668 F.2d 740 (3d Cir.1982)
 
 
 [7]
 Astra also claimed that the district court had erred in admitting into evidence a videotape entitled "A Day in the Life of Harrikah Stanton"; however, Astra does not appear to have pursued that objection on appeal
 
 
 [8]
 We will not discuss the propriety of the district judge's remarks to the panel of jurors at the retrial on damages. Inasmuch as we will remand the case for a new trial on both damages and liability, any issues that relate exclusively to the second trial are moot
 
 
 [9]
 Despite the fact that we will remand for a new trial, we must discuss whether the evidence was sufficient to sustain the liability verdict because Astra here appeals from a denial of its motion for judgment n.o.v. on that basis
 
 
 [10]
 The 1938 Act required that all applications be filed with the Secretary of Agriculture, but the Secretary assigned his functions in this area to the FDA. The FDA is now a part of the Department of Health and Human Services ("HHS"), and the Secretary of HHS has continued to delegate his responsibilities under the 1938 Act to the Commissioner of the FDA. 21 C.F.R. Sec. 5.10 (1983)
 
 
 [11]
 "Subsection (e)," mentioned in 21 U.S.C. Sec. 355(j)(1), refers to 21 U.S.C. Sec. 355(e) (1976), which specifies the manner in which the Secretary of HHS (or the FDA) may withdraw approval of a drug application
 
 
 [12]
 21 U.S.C. Sec. 355(j)(2) (1976) further provides that "[e]very person required under this section to maintain records, and every person in charge or custody thereof, shall, upon request of an officer or employee designated by the Secretary, permit such officer or employee at all reasonable times to have access to and copy and verify such records."
 
 
 [13]
 21 C.F.R. Sec. 130.35(e) (1972) [redesignated 21 C.F.R. Sec. 310.302(e) (1983) ] provides:
 After the submission of the initial reports required by paragraphs (a) and (b) of this section, each such applicant shall, after 1 year, submit for the reporting period reports of the kinds required by Sec. 130.13(b)(4), not later than each anniversary date of the effectiveness of the new-drug application....
 Section 130.35(b)(7), which is part of the "paragraph (b)" to which Sec. 130.35(e) refers, requires the submission, "as soon as the review reveals such facts," of
 any information concerning any side-effect, injury, toxicity, or sensitivity reaction, or any unexpected incidence or severity thereof, which by kind, or incidence or severity is not fully disclosed in the labeling .... Such information shall include full reports of all available information with respect to any deaths apparently related to drug administration whether or not determined to be attributable to the drug. Any such information previously submitted for inclusion in the new-drug application ... need not be resubmitted.
 Id. Sec. 130.35(b)(7). And Sec. 130.13(b)(4), also referenced in Sec. 130.35(e), requires the applicant to submit information specified in Sec. 130.13(a), including "[u]npublished reports of clinical experience, studies, investigations, and tests conducted by the applicant or reported to him by any person involving the drug that is the subject of the application and related drugs ...," id. Sec. 130.13(a)(1).
 
 
 [14]
 Section 130.35(f) [redesignated 21 C.F.R. Sec. 310.302(f) (1983) ] decrees that "[e]ach applicant shall submit all information reported to or received by him of the kinds required by Sec. 130.13(b)(1) and (2) as required in that section." Section 130.13(b)(1) relates to information concerning mixups in drugs or labeling as well as bacteriological, chemical, or other changes in or deterioration of the drug. Section 130.13(b)(2) provides:
 As soon as possible, and in any event within 15 working days of its receipt by the applicant, [the applicant shall submit] complete records or reports concerning any information of the following kinds:
 (i) information concerning any unexpected side effect, injury, toxicity, or sensitivity reaction or any unexpected incidence or severity thereof associated with clinical uses, studies, investigations, or tests, whether or not determined to be attributable to the drug, except that this requirement shall not apply to the submission of information described in a written communication to the applicant from the Food and Drug Administration as types of information that may be submitted at other designated intervals.
 "Unexpected" as used in this subdivision refers to conditions or developments not previously submitted as part of the new-drug application or not encountered during clinical trials of the drug, or conditions or developments occurring at a rate higher than shown by information previously submitted as part of the new-drug application, or than encountered during such clinical trials.
 (ii) information concerning any unusual failure of the drug to exhibit its expected pharmacological activity.
 
 
 [21]
 C.F.R. Sec. 130.13(b)(2) (1972)
 
 
 [15]
 Eighty-seven reports were received between 1960 and May 27, 1964. In addition, there are reports of adverse reactions experienced by patients outside the United States. There were 42 foreign adverse-reaction reports between May 1964 and 1971, 27 between 1959 and 1964, and 39 between 1972 and 1975
 
 
 [16]
 21 U.S.C. Sec. 321(p) (1976) defines a "new drug" as
 (1) Any drug (except a new animal drug or an animal feed bearing or containing a new animal drug) the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof, except that such a drug not so recognized shall not be deemed to be a "new drug" if at any time prior to the enactment of this chapter it was subject to the Food and Drugs Act of June 30, 1906, as amended, and if at such time its labeling contained the same representations concerning the conditions of its use; or
 (2) Any drug (except a new animal drug or an animal feed bearing or containing a new animal drug) the composition of which is such that such drug, as a result of investigations to determine its safety and effectiveness for use under such conditions has become so recognized, but which has not, otherwise than in such investigations, been used to a material extent or for a material time under such conditions.
 Astra's counsel advised Astra that Xylocaine was not a "new drug" because it had been marketed since 1949 and was generally recognized by experts as safe and effective. Kaplan testified on cross-examination that he did not become counsel to Astra until early in 1965; his advice as to the non-necessity of compliance with Sec. 130.35 thus dates only from that time. See Transcript of 1979-1980 Trial [hereinafter "Transcript"], vol. 20, at 220-22. It is unclear why Astra failed to comply with Sec. 130.35 between May 1964 and early 1965. But see Letter from John F. Palmer, M.D., to Astra (Oct. 2, 1963) (discussed infra in text).
 
 
 [17]
 A large number of the nation's pharmaceutical manufacturers filed a lawsuit seeking declaratory and injunctive relief to bar the application of Sec. 130.35's reporting requirements to manufacturers of any drug which is not a "new drug" as that term is defined in the Act by reason of the fact that immediately prior to October 10, 1962, it had been used to a material extent and for a material time and was commercially distributed for the same uses by such person and was then and is now "generally recognized * * * as safe" for its labeled uses
 Abbott Laboratories v. Celebrezze, Civ. No. 2884 (D.Del. July 23, 1964) (Complaint at 20). The case ultimately was dismissed without prejudice by stipulation of the parties on August 12, 1970.
 Plaintiffs never did obtain an injunction against, or even a stay of, the effectiveness of Sec. 130.35, and it is beyond question that, in the absence of a stay, a refusal to comply with regulations cannot be excused merely because the regulated party has filed a lawsuit challenging the validity of those regulations, see, e.g., Life & Casualty Ins. Co. v. McCray, 291 U.S. 566, 574-75, 54 S.Ct. 482, 486, 78 L.Ed. 987 (1934); United States v. St. Regis Paper Co., 285 F.2d 607, 614 (2d Cir.1960), aff'd, 368 U.S. 208, 223-24, 82 S.Ct. 289, 298, 7 L.Ed.2d 240 (1961). Moreover, Astra was not a party to the 1964 lawsuit and cannot rely on the pendency of that action to excuse its noncompliance with Sec. 130.35.
 
 
 [18]
 The letter stated, in relevant part:
 Reference is made to your new drug application submitted pursuant to section 505(b) of the Federal Food, Drug, and Cosmetic Act for Xylocaine Hydrochloride (lidocaine hydrochloride) Aqueous Solution.
 In reviewing your new drug application, we note that the last report submitted by you is dated November 24, 1965. According to section 130.13 of the regulations and section 505(j) of the Act, it is required that you submit annually a report containing the following information: clinical experience, adverse reactions, animal experience, control, manufacturing and stability data, labeling including the latest package insert and promotional information. If you have no information to report for any of the above items this fact should also be stated. It is also required that distribution figures be stated in this annual report.
 App. at A562.
 
 
 [19]
 The Commissioner's statements, dated May 20, 1968, read as follows:
 (a) Over the years since 1938 the Food and Drug Administration has given informal advice to inquirers as to the new-drug status of preparations. These drugs have sometimes been identified only by general statements of composition. Generally, such informal opinions were incorporated in letters that did not explicitly relate all of the necessary conditions and qualifications such as the quantitative formula for the drug and the conditions under which it was prescribed, recommended, or suggested: This has contributed to misunderstanding and misinterpretation of such opinions.
 (b) These informal opinions that an article is "not a new drug" or "no longer a new drug" require reexamination under the Kefauver-Harris Act (Public Law 87-781; 76 Stat. 788-89). In particular, when approval of a new-drug application is withdrawn under provisions of section 505(e) of the Federal Food, Drug, and Cosmetic Act, a drug generally recognized as safe may become a "new drug" within the meaning of section 201(p) of said Act as amended by the Kefauver-Harris Act on October 10, 1962. This is of special importance by reason of proposed actions to withdraw approval of new-drug applications for lack of substantial evidence of effectiveness as a result of reports of the National Academy of Sciences--National Research Council on its review of drug effectiveness; for example, see the notice published in the FEDERAL REGISTER of January 23, 1968 (33 F.R. 818), regarding rutin, quercetin, et al.
 (c) Any marketed drug is a "new drug" if any labeling change made after October 9, 1962, recommends or suggests new conditions of use under which the drug is not generally recognized as safe and effective by qualified experts. Undisclosed or unreported side effects as well as the emergence of new knowledge presenting questions with respect to the safety or effectiveness of a drug may result in its becoming a "new drug" even though it was previously considered "not a new drug." Any previously given informal advice that an article is "not a new drug" does not apply to such an article if it has been changed in formulation, manufacture, control, or labeling in a way that may significantly affect the safety of the drug.
 (d) For these reasons, all opinions previously given by the Food and Drug Administration to the effect that an article is "not a new drug" or is "no longer a new drug" are hereby revoked. This does not mean that all articles that were the subjects of such prior opinions will be regarded as new drugs. The prior opinions will be replaced by opinions of the Food and Drug Administration that are qualified and current on when an article is "not a new drug," as set forth in Subpart D (proposed) of this Part 130.
 
 
 [33]
 Fed.Reg. 7758 (1968) (codified at 21 C.F.R. Sec. 130.39) (redesignated 21 C.F.R. Sec. 310.10)
 
 
 [20]
 The NAS-NRC ultimately approved Xylocaine for effectiveness, and FDA's Drug Efficacy Study Implementation ("DESI") notified Astra on March 24, 1971, that FDA approval would be forthcoming. Letter from Paul A. Bryan, M.D., to Astra (March 24, 1971). See 36 Fed.Reg. 6909-11 (1971) (publishing results of study)
 
 
 [21]
 There is another problem with Astra's claim that Xylocaine was not a "new drug" between 1964 and 1971. In order for a drug not to be considered a "new drug," it must be generally recognized by experts as both safe and effective. Efficacy, however, was not a factor in the federal regulatory scheme until the enactment of the 1962 amendments to the 1938 Food, Drug, and Cosmetic Act. Weinberger v. Hynson, Westcott & Dunning, Inc., supra, 412 U.S. at 613-15, 93 S.Ct. at 2475-76. Between 1938 and 1962, regulators concerned themselves only with the safety of marketed drugs. The 1962 amendments opened up a new area of regulatory concern and focused more attention than ever before on the effectiveness of drugs, thereby changing the criteria by which drugs were to be evaluated. Thus, in urging us to exempt drugs marketed prior to 1962 from Sec. 130.35 by not classifying them as "new drugs," Astra would have us shield those drugs, at least in part, from medical and regulatory scrutiny under different--and more stringent--standards
 
 
 [22]
 Although Pennsylvania generally follows the Restatement (Second) of Torts, which provides that "[t]he court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation," id. Sec. 286 (emphasis added), it seems clear from the authorities cited in text that Pennsylvania law views a statutory violation as conclusive evidence of negligence, in the absence of an excuse for that violation, see infra. This interpretation of a statutory violation as negligence per se seems especially compelling here in light of the fact that
 "the public interest requires the holding of companies which make and sell drugs and medicine for use in the human body to a high degree of responsibility under both the criminal and civil law for any failure to exercise vigilance commensurate with the harm which would be likely to result from relaxing it."
 Incollingo v. Ewing, 444 Pa. 263, 287, 282 A.2d 206, 219 (1971) (quoting Henderson v. National Drug Co., 343 Pa. 601, 610, 23 A.2d 743, 748 (1942)); cf. Griffin v. United States, 351 F.Supp. 10, 34 (E.D.Pa.1972), aff'd, 500 F.2d 1059, 1069-70 (3d Cir.1974) (Division of Biologic Standards' releasing drug in violation of Division's own regulations constituted negligence per se under Pennsylvania law). We emphasize, however, that the nomenclature "negligence per se" does not mean that a plaintiff seeking to recover under that doctrine may dispense with establishing proximate cause. We discuss the causation question in Parts II.B.2 and II.C.2, infra.
 
 
 [23]
 Relying exclusively on Karle v. National Fuel Gas Distrib. Corp., 448 F.Supp. 753 (W.D.Pa.1978), Astra claims that "[t]he regulations ... should not be permitted to form the foundation of the finding of negligence," Brief at 18. Karle read Pennsylvania law as requiring not only that the defendant's violation of a statute or regulation be the proximate cause of plaintiff's injury but also that "the statute or regulation ... clearly apply to the conduct of the defendant." 448 F.Supp. at 767. Accordingly, Astra insists that the regulations here at issue did not "clearly apply" to Xylocaine
 Our review of Pennsylvania law, including the cases cited in Karle, reveals no such prerequisite for a finding of negligence based on violation of a statute or regulation. Whenever a defendant's unexcused violation of a statute or regulation proximately causes the plaintiff's injuries, the defendant will be considered negligent and liable for his conduct. Moreover, even if we were to accept Astra's argument, we note that Astra knew or should have known by 1968, and unquestionably knew by 1969, that the FDA expected Astra to comply with the regulations.
 
 
 [24]
 Section 288A of the Restatement provides:
 (1) An excused violation of a legislative enactment or an administrative regulation is not negligence.
 (2) Unless the enactment or regulation is construed not to permit such excuse, its violation is excused when
 (a) the violation is reasonable because of the actor's incapacity;
 (b) he neither knows nor should know of the occasion for compliance;
 (c) he is unable after reasonable diligence or care to comply;
 (d) he is confronted by an emergency not due to his own misconduct;
 (e) compliance would involve a greater risk of harm to the actor or to others.
 See Bumbarger v. Kaminsky, --- Pa.Super. ---, 457 A.2d 552, 555 (1983) (quoting and discussing Sec. 288A); Miller v. Hurst, 302 Pa.Super. 235, 448 A.2d 614, 618, 619 n. 8 (1982) (recognizing excuses for negligence per se). Because this list of excuses was not intended to be exhaustive, see Bumbarger v. Kaminsky, supra, 457 A.2d at 555 n. 2 (citing comment a to Sec. 288A), we must also consider other excuses offered by Astra.
 
 
 [25]
 As part of their cross-appeal, plaintiffs contend that the district court erred in refusing to instruct the jury that Astra's failure to file the required adverse-reaction reports constituted negligence as a matter of law. Plaintiffs claim that the lack of such an instruction unfairly prejudiced their ability to obtain punitive damages. Because the two principal reasons offered by Astra--advice of counsel and availability of reports to factory inspectors--are legally insufficient to excuse the statutory and regulatory violations at issue, it may well be that the district court erred in denying the requested instruction. We need not decide this question, however, because the case will be retried, and we cannot now predict what evidence Astra will adduce as to excusability or what charge the court will give as to negligence
 
 
 [26]
 The jury's findings came as affirmative answers to "Special Questions" 9 and 10:
 
 
 [9]
 (a) Was Astra negligent in failing to file annual reports with the Food and Drug Administration (FDA) as required by Sec. 130.35(e) of the Food & Drug Regulations?
 (b) If Yes, was this failure a substantial factor in causing plaintiff's injuries?
 
 
 [10]
 (a) Was Astra negligent in failing to file unexpected adverse reaction reports with the Food and Drug Administration as required by Sec. 130.35(f) of the Food & Drug Regulations?
 (b) If Yes, was this failure a substantial factor in causing plaintiff's injuries?
 
 
 [27]
 The category of "near-fatalities" included instances of cardiac or respiratory arrest. Transcript, vol. 4, at 168
 
 
 [28]
 Dr. Done also stressed the extent to which the FDA depends on manufacturers' reporting of clinical experience to keep the agency apprised of the safety and efficacy of marketed drugs. Transcript, vol. 4, at 146-47; vol. 6, at 55, 78
 
 
 [29]
 We also recognize the potential inconsistency between the jury's findings as to the effect of the failure to file the adverse-reaction reports and its findings that Astra had not failed adequately to warn the medical community of Xylocaine's characteristics, see infra Part IV. We believe, however, that such matters relate not to the sufficiency of the evidence to support the verdict but, rather, to necessity of retrial because of the apparent compromise reached by the first jury in rendering its verdict
 
 
 [30]
 We read this case as being quite different from Greiner v. Volkswagenwerk Aktiengesellschaft, supra, upon which Astra relies. Plaintiff in Greiner had been injured when the Volkswagen in which she was riding overturned during a sharp steering maneuver. Greiner sued the manufacturer and alleged as proximate cause the fact that the company had failed to warn its customers of the propensity of Volkswagens to overturn during sharp turns. Assuming arguendo the existence of a duty to warn and the breach of that duty, the district court entered judgment for the defendant on the ground that a warning could not possibly have prevented the accident. The car had overturned when the driver found herself heading for a concrete bridge railing approximately 10 feet away while traveling at 30 to 60 miles per hour. (A car moving at 30 miles per hour would travel 10 feet in one quarter of a second.) The court deemed it inconceivable that, "had there been a warning, [the driver] would have recalled it, considered it and then intentionally crashed head-on into a concrete rail," 429 F.Supp. at 497, to avoid the risk of overturning during a sharp swerve to one side. Moreover, "when [the driver] found herself ten feet from the railing, a serious accident was inevitable, warning or no warning, and plaintiff made no showing that one [i.e., crashing] would have been less devastating than the other [i.e., overturning]." Id. Finally, the court labeled "pure conjecture or guess" the claim that the driver might never have purchased the car had she been warned of the risk of its overturning. Id. at 498. Accordingly, the court found no causal link between the accident and the failure to warn
 The inferences of causation are far stronger in the case before us. While it was pure speculation that the driver in Greiner might not have bought a Volkswagen had she received the warning that she claimed was due to her, it is far less speculative to conclude that the FDA would have taken some action had it received the reports that never were filed and that physicians also would have paid attention to that information. The FDA has a statutory duty to monitor drugs and even to remove them from the market, if necessary; doctors have professional and legal obligations to keep abreast of the latest medical research and to adapt their practices to those findings. The purchaser and driver of the car in Greiner, by contrast, had no such expertise or obligations. It therefore is reasonable to expect more from the FDA and the doctors than from the car-purchaser.
 The analogy between Greiner and this case is further undercut when we consider the time-frames involved in the two cases. While the driver in Greiner, who was heading at 30 to 60 miles per hour toward a rail only 10 feet away, would have had virtually no time at all to consider and possibly act upon a warning, the FDA would have had years to disseminate and act upon the information contained in the adverse-reaction reports, had they been filed as required.
 
 
 [31]
 Section 402A provides:
 (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, ....
 As we have noted in the past, Pennsylvania courts subscribe to the principles of Sec. 402A, see, e.g., Hammond v. International Harvester Co., 691 F.2d 646, 649-50 (3d Cir.1982) (providing overview of history of Sec. 402A in Pennsylvania); Sochanski v. Sears, Roebuck & Co., 621 F.2d 67, 69 (3d Cir.1980), and we therefore must apply the Second Restatement in this diversity case. Pennsylvania law, however, has departed slightly from the standard formulation of Sec. 402A by taking from the jury the question whether a product is "unreasonably dangerous" and requiring the court to make that determination as a matter of law. See Azzarello v. Black Bros. Co., 480 Pa. 547, 554-59, 391 A.2d 1020, 1025-27 (1978). According to the Pennsylvania Supreme Court:
 the phrases "defective condition" and "unreasonably dangerous" as used in the Restatement formulation are terms of art invoked when strict liability is appropriate. It is a judicial function to decide whether, under plaintiff's averment of the facts, recovery would be justified; and only after this judicial determination is made is the cause submitted to the jury to determine whether the facts of the case support the averments of the complaint. They do not fall within the orbit of a factual dispute which is properly assigned to the jury for resolution.
 
 
 [480]
 Pa. at 558, 391 A.2d at 1026
 
 
 [32]
 The jury's verdict came in answer to Special Question 11:
 
 
 [11]
 If your answers to questions # 9 and # 10 [see supra note 26] are No, then do not answer this question. If your answer to either question # 9 or # 10 was Yes, then answer the following question:
 (a) Did Astra's failure to file adverse reaction reports on Xylocaine with the Food & Drug Administration render the product defective by depriving the FDA of information necessary to make an informed judgment concerning the conditions under which Xylocaine could be safely marketed?
 (b) If Yes, was this failure a substantial factor in causing [Harrikah's] injuries?
 
 
 [33]
 As we have noted, see supra note 31, the jury need not--and, in fact, should not--consider the terms "defective condition" and "unreasonably dangerous"; rather, these terms "merely represent ... label[s] to be used where it is determined [by the court] that the risk of loss should be placed upon the supplier," Azzarello v. Black Bros. Co., supra note 31, 480 Pa. at 556, 391 A.2d at 1025
 
 
 [34]
 We recognize that comment k to Sec. 402A exempts from strict liability the manufacturer of a product (such as a drug) that, "in the present state of human knowledge, [is] quite incapable of being made safe for [its] intended and ordinary use." This exemption, however, applies only when the product that caused harm was "properly prepared and marketed," id.; according to the jury, Xylocaine could not be so characterized. In answering Special Question 11, supra note 32, the jury concluded that Astra's failure to file the adverse-reaction reports "render[ed] the product defective by depriving the FDA of information necessary to make an informed judgment concerning the conditions under which Xylocaine could be safely marketed." Proper marketing would seem possible only when the FDA has received full information about the drug's characteristics and has made an informed decision to allow the manufacturer to market the drug
 
 
 [35]
 The proximate-cause analysis with respect to the Sec. 402A claim is more abbreviated than it was in the negligence context because that analysis played an important part in the determination that Xylocaine was a defective product. In discussing whether Astra's negligence in failing to file the required reports was a "substantial factor" in causing Harrikah's injuries, we focused on the question whether the FDA would have acted on those reports had they been filed. In the Sec. 402A context, Xylocaine's being a defective product itself depends on a showing that the FDA would have taken some action, for it was the reasonable consumer's expectation of that action and Astra's interference with the agency's performance that created the defect in the product
 
 
 [36]
 It seems clear that the jury understood that it did not have to answer Special Question 23, for the jury left blank Special Questions 24 and 25, which were identical to Special Question 23 except for the substitution of Dr. Fabian and Harrisburg Hospital, respectively, for Dr. Bowman. Thus, the fact that the jury chose to answer Special Question 23 at all is significant
 
 
 [37]
 Despite its answer to Special Question 23, however, the jury did not find Dr. Bowman liable at all. In Special Question 17, the jury found negligent the manner in which Dr. Bowman had administered the Xylocaine to Harrikah but did not deem that negligence to have been a substantial factor in causing the child's injuries
 
 
 [38]
 Rule 49 provides:
 (a) Special Verdicts. The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. In that event the court may submit to the jury written questions susceptible of categorical or other brief answer or may submit written forms of the several special findings which might properly be made under the pleadings and evidence; or it may use such other method of submitting the issues and requiring the written findings thereon as it deems most appropriate. The court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue. If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives his right to a trial by jury of the issue so omitted unless before the jury retires he demands its submission to the jury. As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict.
 (b) General Verdict Accompanied by Answer to Interrogatories. The court may submit to the jury, together with appropriate forms for a general verdict, written interrogatories upon one or more issues of fact the decision of which is necessary to a verdict. The court shall give such explanation or instruction as may be necessary to enable the jury both to make answers to the interrogatories and to render a general verdict, and the court shall direct the jury both to make written answers and to render a general verdict. When the general verdict and the answers are harmonious, the appropriate judgment upon the verdict and answers shall be entered pursuant to Rule 58. When the answers are consistent with each other but one or more is inconsistent with the general verdict, judgment may be entered pursuant to Rule 58 in accordance with the answers, notwithstanding the general verdict, or the court may return the jury for further consideration of its answers and verdict or may order a new trial. When the answers are inconsistent with each other and one or more is likewise inconsistent with the general verdict, judgment shall not be entered, but the court shall return the jury for further consideration of its answers and verdict or shall order a new trial.
 (Emphasis added.)
 
 
 [39]
 McCollum, a wrongful-discharge case, is distinguishable on its facts from the case before us. The McCollum jury found that defendant had not wrongfully discharged plaintiff and therefore awarded no compensatory damages (questions 1 and 2); however, the jury then proceeded to find that defendant had acted "maliciously, wantonly or oppressively" in effecting the discharge and awarded plaintiff $15,000 in punitive damages (questions 3 and 4). The district court read the answers as inconsistent and resubmitted the questions with instructions that the jury not answer questions 2 through 4 if it were to answer the first question favorably to defendant. 579 F.2d at 870
 On appeal, the Fourth Circuit held the resubmission improper because "[a]t the time of the recommitment there was before the court a decisive verdict, an unequivocal finding of no wrongful conduct by [defendant]." Id. at 871. The jury probably intended--impermissibly--only to punish defendant. The case sub judice, however, differs significantly from McCollum in its lack of an "unequivocal finding" in favor of either party. The answers to the questions were inconsistent among themselves as well as with the award of damages, see supra and infra Part IV.
 It is true that the Fourth Circuit also held more broadly that resubmission of Rule-49(a) questions is improper. Our ruling, however, in no way depends on our distinguishing McCollum.
 
 
 [40]
 We note that the Fourth Circuit relied heavily in McCollum on a Fifth Circuit case, Griffin v. Matherne, 471 F.2d 911, 917 n. 6 (5th Cir.1973), that predated Alverez and Mercer. 579 F.2d at 871. The Fifth Circuit's apparent change of heart further dissuades us from relying on McCollum
 
 
 [41]
 Our opinion in Andrasko v. Chamberlain Mfg. Corp., 608 F.2d 944 (3d Cir.1979), did not discuss the availability vel non of resubmission under Rule 49(a) as a means of harmonizing inconsistent answers to interrogatories. Nor did Smith v. Danyo, 585 F.2d 83 (3d Cir.1978); De Filippo v. Ford Motor Co., 516 F.2d 1313 (3d Cir.), cert. denied, 423 U.S. 912, 96 S.Ct. 216, 46 L.Ed.2d 141 (1975); Franki Found. Co. v. Alger-Rau & Assocs., Inc., 513 F.2d 581 (3d Cir.1975); or Halprin v. Mora, 231 F.2d 197 (3d Cir.1956), all cited to us by Astra, reach this issue
 
 
 [42]
 As we have stated in the past, our scope of review in determining the propriety of an order granting only a partial retrial is whether the district court abused its discretion in so ruling. See Vizzini v. Ford Motor Co., 569 F.2d 754, 759-60 (3d Cir.1977) (reviewing trial judge's "sound exercise of discretion" in limiting new trial to damages)
 
 
 [43]
 The second jury awarded Harrikah Stanton and her mother $1,908,371, as opposed to $315,000, when deciding only the damages question; we note, however, that we may not take this second, higher verdict into account in deciding whether the district court abused its discretion in limiting that new trial to damages
 
 
 [44]
 The cost of institutionalization was placed at $364,253
 
 
 [45]
 The jury awarded damages by answering a question predicated upon a finding of liability even though the answers to other questions apparently absolved Astra of liability. The jury also answered a question that should not have been answered at all unless both Astra and Dr. Bowman had been found liable pursuant to the preceding "special questions."
 
 
 [46]
 We note in particular that this refusal to find a failure to warn arguably conflicts with the finding that Astra had marketed a defective product within the meaning of Sec. 402A, for the latter finding might seem to imply that Astra had not done an adequate job of informing the FDA and the medical community of the risks associated with Xylocaine. The district court attempted to resolve this possible inconsistency in denying Astra's motion for judgment n.o.v.:
 It is plaintiffs' position that, while the jury may have concluded that the warnings to Dr. Bowman and the Hospital employees were adequate in light of the known risks inherent in such a drug (a point defense counsel made to the jury), if the FDA had been allowed to perform its statutory duty and the medical community had become aware of the reported adverse reactions, the risks associated with the drug would have been better understood and more widely appreciated. In other words, the FDA and members of the medical community would have taken some action to increase the level of awareness of persons, such as Dr. Bowman and the employees of Harrisburg Hospital, of the risks associated with the use of Xylocaine and the precautions essential to its safe use. Dr. Henry Price, former Chairman of the Department of Anesthesiology at Hahnemann Hospital in Philadelphia, testified that, in his opinion, because Astra failed to communicate to the medical community its knowledge that there could be reactions even with a low dosage, the people who administered the drug "in this case" were caused to refrain from taking precautions which "would have obviated the difficulty." (N.T.Vol. IX, 62) Under the evidence in this record, the jury could have reasonably determined that, if Dr. Bowman and the employees of Harrisburg Hospital were aware of the potential risks involved, they would have taken precautions that would have avoided respiratory and cardiac arrest.
 Stanton II, supra, slip op. at 10 (footnote omitted). Although we hold that the district court did not err in denying Astra's motion, we nevertheless cannot ignore the lengths to which the court was pushed in attempting to reconcile the jury's findings.
 
 
 [47]
 Plaintiffs also contended in the district court that the court had erred in refusing to instruct the jury to disregard Astra's evidence offered to establish the reasonableness of the company's "take it for granted" advertising because Astra had not timely complied with plaintiffs' discovery request regarding that promotional campaign. Plaintiffs appear to have abandoned this claim on appeal
 
 
 [48]
 Fed.R.Evid. 403, which provides for the exclusion of relevant evidence whose "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence," does not counsel a contrary conclusion on these facts
 
 
 [49]
 As we noted above, see supra Part II.B.1, however, counsel's testimony may not be introduced to excuse Astra's failure to file the reports